**Carolyn JORDAN, etc., et al., Plaintiffs,**

**Sandra M. Pierce and Joyce S. Oyler, Plaintiffs-Intervenors,**

**v.**

**John WILSON, etc., et al., Defendants.**

**Civ. A. No. 75–19–N.**

United States District Court,
M.D. Alabama, N.D.

Nov. 17, 1986.

Order and Injunction Nov. 25, 1986.

Morris S. Dees, Jr., Montgomery, Ala., for plaintiffs.

Ira Burnim, M. Wayne Sabel, Montgomery, Ala., for Pierce & Oyler.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Wade L. Moss and Montgomery City-County Personnel Bd.

Robert C. Black, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for all other defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In this action, a class of female police officers and two individual female officers charge that officials of the City of Montgomery, Alabama and its police department denied them promotions because of their sex, and that these officials retaliated against one of them for bringing such charges. Based on the evidence presented at a nonjury trial, the court concludes that the allegations of discrimination and retaliation have merit and that appropriate individual and class-wide relief is due.

### I.

This action was originally brought in 1975 by Carolyn Jordan, who alleged sex discrimination in the hiring policies of the police department. Jordan sued various officials of the City of Montgomery and its police department. In response to the original filing, this court found that officials of the city and its police department had failed "to employ females on the same basis as males," Memorandum Opinion of March 12, 1976, at 4, and the court ordered that city and police officials hire, assign, promote, and compensate all female police officers on an equal basis with male officers. Order of March 12, 1976. The court also broadly enjoined city and police officials "[f]rom engaging in any act or practice which has the purpose or effect of discriminating against any employee, any applicant, or any potential applicant for employment with the Montgomery Police Department because of the individual's sex." *Id.*

The present phase of this lawsuit began in 1983 when a female police officer, Sandra M. Pierce, intervened to pursue her claims of sex discrimination, principally in promotion. She was later joined in 1984 by another female police officer, Joyce S. Oyler. On January 3, 1985, the court certified this phase of the lawsuit as a class action with Pierce and Oyler as representatives of a class composed of "all past, present and

future female police officers of the Montgomery police department, with regard to all employment practices except hiring." *Jordan v. Swindall,* 105 F.R.D. 45, 46 (M.D.Ala.1985).[1]

Pierce and Oyler charge officials of the city and its police department with violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17. Title VII prohibits both "disparate treatment," whereby an employer intentionally treats some employees less favorably than others because of their sex, and "disparate impact," whereby an employer's practice, though facially neutral, falls more harshly on one sex and cannot be justified by business necessity. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Claims of disparate treatment and disparate impact therefore involve different burdens of proof, but they may be raised with the same set of facts. *Id.; see also Griffin v. Carlin,* 755 F.2d 1516, 1522–26 (11th Cir.1985). Title VII also forbids employers from retaliating against employees who file charges of discrimination or engage in other protected activities. 42 U.S.C.A. § 2000e–3(a). Pierce and Oyler assert both disparate impact and disparate treatment claims on behalf of themselves and the plaintiff class. In addition, Pierce claims that city and police officials retaliated against her for engaging in protected activity.

Pierce and Oyler also charge officials of the city and its police department with violations of the equal protection clause of the fourteenth amendment to the U.S. Constitution, and they assert their claim under 42 U.S.C.A. § 1983. The court will consider Pierce and Oyler's section 1983 claim in tandem with their Title VII disparate treatment claim, because the legal elements of a section 1983 claim and a Title VII disparate treatment claim are identical; for both, the plaintiff must prove intentional discrimination. *Stallworth v. Shuler,* 777 F.2d 1431, 1433 (11th Cir.1985).[2]

## II.

Before considering the merits of Pierce and Oyler's claims, the court must address defenses asserted by officials of the city and its police department that the claims are not timely.

## A.

The first defense relating to timeliness is that Pierce and Oyler's claims are barred by the applicable statutes of limitations.

■ In order to sue under Title VII, an employee must first file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of when the employee knew or had reason to know of the allegedly discriminatory act. 42 U.S.C.A. § 2000e–5; *Stafford v. Muscogee County Board. of Education,* 688 F.2d 1383, 1387 (11th Cir. 1982). Neither Pierce's nor Oyler's Title VII claims are time-barred.

■ Pierce filed charges of discrimination with the EEOC on December 29, 1982, and filed amended charges on February 23, 1983. Within 180 days prior to December 29, at least three allegedly discriminatory events occurred. First, the police department published the 1982 register, which is the yearly ranking that determines each officer's chances for promotion. Second, the 1981 register became ineffective, thus precluding the possibility that Pierce could be promoted on the basis of the 1981 rankings. Finally, at least six male officers were promoted to sergeant. Because these allegedly discriminatory events occurred within the statutory period, Pierce's Title VII claims are not time-barred.

---

1. John Wilson was substituted as a defendant for Charles Swindall, former police chief, when Wilson temporarily assumed the position of police chief in January 1986.

2. Pierce and Oyler also claim that city and police officials violated the March 12, 1976 order. However, because the reach of Title VII and section 1983 is, at least, as far as the March 12 order, the court does not consider the March 12 order separately.

■ Oyler's situation is quite similar. She filed charges of discrimination with the EEOC on August 21, 1984, and amended charges on October 25, 1984. In the 180-day period prior to August 21, the department published the 1984 register, ceased using the 1983 register, and promoted at least three male police officers to the rank of lieutenant. As a result, Oyler's Title VII claims are not time-barred.

■ Pierce and Oyler face equally little problem with respect to their section 1983 claim. In *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court interpreted section 1983 "as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims," *id.*, at 275, 105 S.Ct. at 1947, and observed that section 1983 claims "are best characterized as personal injury actions." *Id.*, at 280, 105 S.Ct. at 1949. The Eleventh Circuit subsequently decided that federal courts in Alabama should apply 1975 Ala.Code § 6–2–34(1), which provides a six-year statute of limitations in section 1983 actions. *Jones v. Preuit v. Mauldin*, 763 F.2d 1250, 1256 (11th Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986). Pierce and Oyler filed their complaints-in-intervention in this cause on September 26, 1983, and August 21, 1984, respectively. Since they allege discriminatory acts within six years of these dates, their section 1983 claim is timely.

### B.

Second, throughout the trial of this cause, city and police officials objected to the admission of evidence of discriminatory acts purportedly occurring beyond the limitations periods of Pierce and Oyler's claims. The court overruled these objections with an explanation that it now sets forth in detail.

■ City and police officials argue that, in deciding the Title VII claims, the court may not consider evidence of allegedly discriminatory acts that were not made the subject of a timely complaint to the EEOC; according to the officials, events that oc-

curred more than 180 days before Pierce and Oyler filed their charges should not be admissible as evidence. This position is without merit. Evidence of prior acts "may constitute *relevant background evidence* in a proceeding in which the status of a current practice is at issue," *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (emphasis added); "the critical question is whether any present violation exists." *Id.* *See also, e.g., Walker v. Jefferson County Home*, 726 F.2d 1554, 1557 (11th Cir.1984) ("In a disparate impact case, the court clearly may consider evidence of prior discriminatory acts if such evidence is relevant to show independently actionable conduct occurring within the statutory period").

■ Pierce and Oyler do not challenge the employment practices of the police department as merely a perpetuation of past discrimination; rather, they allege that independently actionable conduct occurred within the statutory period and they ask that the court use the evidence of prior practices simply as "relevant background evidence." The evidence of prior discriminatory conduct is admissible for this purpose on Pierce and Oyler's Title VII disparate impact and disparate treatment claims.

■ With respect to the section 1983 claim, the evidence is admissible not only for the above reasons, but also because the six-year statute of limitations encompasses virtually all of the discriminatory acts alleged.

### III.

■ Turning to the merits in this lawsuit, the court will first address Pierce and Oyler's disparate impact claim. As already observed, Title VII prohibits not only intentional discrimination but also "policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *International Brotherhood of Teamsters*, 431 U.S. at 349, 97 S.Ct. at 1861. In general, courts use a three-part analysis to eval-

uate claims of disparate impact. First, the employee must show that the facially neutral employment practice has had a significantly discriminatory impact. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). If that showing is made, the employer must then demonstrate that the employment practice has a manifest relationship to the employment in question, in order to avoid a finding of discrimination. *Id.* Even in such a case, however, the employee may prevail if she establishes that the employer was using the practice as a mere pretext for discrimination, *id.,* at 447, 102 S.Ct. at 2530, or that another practice would serve the employer's legitimate interests without the undesirable effect. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

## A.

### (i)

The first step in establishing a prima facie case of disparate impact is "identification of a neutral employment practice coupled with proof of its discriminatory impact." *Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 619 (11th Cir. 1983), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984). Pierce and Oyler identify the police department's "subjective" promotion system as having a disparate impact on female officers.[3] This system works in the following manner.

The police department ranks its law enforcement personnel as follows from lowest to highest: police officer; corporal or investigator; sergeant; lieutenant; captain; major; deputy chief; and chief. Any rank above police officer is considered supervisory. However, the department promotes officers to the rank of corporal or investigator on a trial basis, primarily to evaluate their supervisory ability and may demote them for any reason. Officers holding the ranks of sergeant through major, on the other hand, enjoy the protections of the city's merit system and obtain promotions according to a process administered by the city, its police department, and its personnel board.

The process for promotion is identical for all ranks from sergeant through major. Every year, the personnel board compiles a list of police officers who seek and are eligible for promotion. The only requirement for eligibility is one or two years of service in the next lower rank. The personnel board then sends this list to the police department, where it is distributed to each of six division commanders. The division commanders, who usually hold the rank of major, give each applicant a numerical rating between one (lowest) and ten (highest) and the police chief and the deputy chief together give each applicant a similar rating. The chief or deputy chief then averages the seven ratings so that each applicant has one rating between one and ten. Based on these ratings, the personnel board prepares a register of all applicants rated from highest to lowest for each rank. Where two applicants have the same rating, the one with greater seniority is placed higher.

According to law, the mayor alone is authorized to promote employees in the police department. When there is a vacancy that the department wishes to fill by promotion, the mayor asks the personnel board to provide either a "standard" or a "selective" certification of applicants off the register for the rank being considered. The standard certification contains the names of the five highest rated officers on the register for the relevant rank; the selective certification contains the names of the five highest rated applicants with certain requested characteristics or qualifications. The mayor then selects for promotion any one of the five applicants from the certification he has requested.

---

**3.** The evidence is and the parties agree that the challenged promotion process is subjective. Subjective selection and promotion procedures may be attacked under the disparate impact theory. *Maddox v. Claytor,* 764 F.2d 1539, 1548 (11th Cir.1985); *Griffin,* 755 F.2d at 1523–25; *Eastland,* 704 F.2d at 619–20.

Emory Folmar has served as mayor of the City of Montgomery since 1977. He does not view his authority to promote within the police department as titular, as routinely accepting the recommendations of the police chief. Rather, Folmar is directly, personally, and intimately involved in the day-to-day operations of the department, so much so that his relationship with the department is more than of a "super-chief of police" rather than that of an external executive who merely sets policy. Folmar has therefore always had a profound effect on how officers are rated by the police chief, his deputy, and the commanders; and Folmar's promotion selections from the certifications have usually reflected his own personal choices.

There are no agreed upon standards, guidelines, or criteria, written or otherwise, to which the six division commanders, deputy chief, chief, and mayor refer in making their rating and promotion decisions; rather, the various participants evaluate the applicants according to their own individual beliefs and standards. Although the evaluators rely on their personal knowledge where available in making their ratings, there is no formal interview process or other regular procedure in which the evaluators meet the officers they must rate. While the evaluators attempt to meet as many officers as possible on an informal basis, evaluators often have to rate officers they do not know well personally.

The police department has never performed a job analysis to determine which traits or skills are related to successful job performance. However, in evaluating the applicants, the division commanders, chiefs, and mayor say they look primarily for the quality of "leadership." In addition, they say they consider "performance," "loyalty," "attitude," and "appearance," among other traits. The evaluators, however, have no shared or common definition of these subjective qualities, and thus there is no uniformity in the evaluators' assessments of these qualities in a particular group of applicants or in their assessments of several groups over a period of time.

Although it is not required, some division commanders say they do consider a few so-called objective criteria in coming up with their ratings. Such criteria include service in certain divisions, particularly patrol and investigation; service in a broad variety of divisions; and military service and managerial experience in civilian employment. Many division commanders also consult the applicants' "semi-annual efficiency reports" in which every officer's direct supervisor regularly rates performance according to several categories. While the overall score on an efficiency report appears to be an objective criterion when considered by the commanders in making their promotional ratings, the bases of the score are as subjective and lacking in uniformity as the commanders' promotional ratings. However, the officers who prepare the efficiency reports generally have greater personal knowledge of those rated than do the division commanders.

Overall, the evidence shows that promotion ratings and promotion decisions are routinely made without reference to any formally established criteria or any objective factors. Furthermore, these subjective decisions are not subject to any sort of formal review; applicants who are dissatisfied with their ratings or their failure to obtain promotion have no recourse.

(ii)

 Having identified the challenged employment practice, the next question the court must address is whether the practice has a disparate impact on women. Disparate impact is most often proved by means of statistical evidence. *See, e.g., Teal, supra; Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Eastland,* 704 F.2d at 619. The figures used must reflect "a significantly discriminatory impact," *Teal,* 457 U.S. at 446–47, 102 S.Ct. at 2530, but the employee's statistics need not prove disproportionate impact with complete mathematical certainty, *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419, 422 (5th Cir.1980), *vacated,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290

(1981), *reinstated and extended,* 657 F.2d 750 (5th Cir.1981), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982), and there is no set mathematical threshold that must be met. *Moore v. Southwestern Bell Telephone Co.,* 593 F.2d 607, 608 (5th Cir.1979). Rather, the employee's burden is merely to establish disparate impact by a preponderance of the evidence, that is, that it is more likely than not that such impact exists. *Cf. Bazemore v. Friday,* —— U.S. ——, ——, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986) (an employee's statistics in a Title VII suit need not prove intentional discrimination with scientific certainty, but only by a preponderance of the evidence).

 Because the police department promotes from within instead of from outside the department, Pierce and Oyler were required to present comparative evidence only with respect to the police department's own workforce rather than the entire workforce in Montgomery or some other arguably relevant area. *See Uncle Ben's, Inc.,* 628 F.2d at 425 (where employer "fills jobs by promotion, the relevant comparison ... is the company's internal work force"). *See also Griffin,* 755 F.2d at 1526. Furthermore, because the promotion system is an extremely subjective one, without any formal and uniform qualifications, Pierce and Oyler need not present evidence concerning male and female officers' relative qualifications. *See Miles v. M.N.C. Corp.,* 750 F.2d 867, 872 (11th Cir.1985) (where employer has no specific qualifications or criteria for employment, employee's statis-

tics were not flawed for failure to indicate whether white applicants were better qualified or more experienced).

 The most striking statistic regarding female officers' success in obtaining promotions is that, with one exception, no female has ever held a rank of lieutenant or above;[4] although this suit was initially filed in 1975, no woman has ever served as police chief, deputy chief, or major, and the one woman who presently holds the rank of captain also appears to be the only woman ever to hold the rank of lieutenant.[5] Thus, the promotion of female officers to lieutenant and above approaches the glaring, "inexorable zero." *See International Brotherhood of Teamsters,* 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23.

The underrepresentation of women in the rank of sergeant or above compared to their representation in the police department as a whole is also quite striking.[6] Of the 377 officers in the police department in January 1985, 11% were female. However, of the 81 positions at the rank of sergeant or above, only 5% were held by women.

Not surprisingly, in light of the figures discussed above, female officers are disproportionately clustered in three positions below sergeant; while women held only 5% of the upper level positions in January 1985, they held 13% of the positions below the rank of sergeant. Relying in part on precisely this sort of comparison, the former Fifth Circuit in *Uncle Ben's, Inc.* concluded that black employees who were challenging

---

**4.** All the statistics and promotion information relied upon by the court reflect the department near the time of trial. Since then the court has been informed that the department has increased the number of female majors to one, the number of female sergeants to five, and the number of female corporals to 12. Such increases since the reopening of this lawsuit have no legal significance on the issue of liability. *See Uncle Ben's, Inc.,* 628 F.2d at 422 (court ascribes "no affirmative legal significance to [the employer's] increase in the number of its Mexican-American employees subsequent to the filing of this suit"). They should and will be considered by the court in fashioning relief, however.

**5.** As a result of the promotion of this female lieutenant to captain, there were no female lieutenants in the department as of January 1985.

**6.** The court uses the rank of sergeant as the cut-off point for comparing upper and lower level positions because, as explained earlier, promotions to positions below sergeant are on a trial basis only and officers holding those positions may be demoted for any reason at all. By contrast, promotions to the positions of sergeant, lieutenant, captain, and major are governed by the city's merit system and officers holding those ranks are protected by that system. The rank of sergeant is also significant because it is the rank that Pierce sought to obtain.

the adverse impact of their employer's promotion system had made out a prima facie case of race discrimination. 628 F.2d at 423 n. 2. *See also Shidaker v. Carlin,* 782 F.2d 746 (7th Cir.1986) (employee made prima facie showing of disparate impact by demonstrating that employer promotes from within and that there is a gross disparity between the percentage of women in upper and lower level positions); *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 826–27 n. 40 (5th Cir.1982) (statistics revealing a concentration of blacks in the lower paid positions in employer's plant led court to affirm finding of discrimination in promotions). The statistics in this case indicate that female officers are concentrated at the lowest levels and thus reflects that the promotion system is discriminatory.

A comparison of the promotion selection rates for male and female officers indicates that the clustering of women in the lowest ranks is not explainable on the grounds simply that there were no women eligible to be promoted. In 1980, 16 of the 132 males who were eligible for promotion to sergeant were promoted; the selection rate for males was thus 12%. No females were promoted to sergeant in 1980 although seven were eligible; the selection rate for female officers was obviously 0%. In 1981 and 1982, the selection rate for male officers was 10% and 5%, respectively; female officers had a selection rate of 0% in both years. Had females been promoted at the same rate as males, one female would have been promoted in both 1980 and 1981.[7] In the three years before Pierce filed her EEOC complaint, therefore, women were clearly being selected for promotion at a rate well below that of men.

The court recognizes that the promotion selection rates for females increased con-
siderably in 1983, when three women were promoted to sergeant, and 1984, when one woman was promoted. The court does not find this evidence terribly persuasive, however, as the 1983 promotions were only made after Pierce filed her charges and amended charges with the EEOC; by the time the 1984 promotions were made, Pierce had already filed her complaint-in-intervention. *See Uncle Ben's, Inc.,* 628 F.2d at 422 (court ascribes "no affirmative legal significance to [the employer's] increase in the number of its Mexican-American employees subsequent to the filing of this suit"). Furthermore, Pierce and Oyler presented evidence reflecting that at least some of the recent promotions did not represent actual gains for female officers in the upper ranks; rather, the women who were promoted merely filled positions that had previously been held by other women. In other words, it appears that some female officers were promoted to fill the token "female sergeant spot." The court hardly considers such promotions as evidence of equal treatment of female officers.[8] The court therefore concludes that female officers have enjoyed a selection rate for promotion to sergeant considerably below that enjoyed by male officers.

The selection rates for promotions to lieutenant are equally skewed. Because the individual figures for each year are so small, the court will consider the overall selection rates for the period from 1979 to 1984. *See E.E.O.C. v. American National Bank,* 652 F.2d 1176, 1197 (4th Cir.1981) (where samples from each year were "concededly small," court considered "overall results" from 1969 to 1975 in comparing proportion of new hires who were black to proportion of blacks in qualified applicant

---

**7.** Another way to look at these figures is to compare the proportion of eligible female candidates for promotion to the number of promotions that were made. Between 1980 and 1983, 7% of the candidates eligible for promotion were female. Given the lack of objective qualifications for promotions, approximately 7% of the 36 promotions made over those three years should have gone to women, assuming the system does not discriminate; had that

indeed been the case, at least 2 women would have been promoted.

**8.** In any case, even after the recent promotions, a far greater proportion of men than women have reached the upper ranks. Of the 335 males on the police force in January 1985, 23%—or nearly one-quarter—have obtained the rank of sergeant or above; of the 42 women, only 10% have advanced as far.

pool); *see also Capaci v. Katz & Besthoff, Inc.,* 711 F.2d 647, 654–56 (5th Cir.1983) (refusing to break down data from 1965 to 1977 by year because such disaggregation would result in extremely small sample groups for each year), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984). Between 1979 and 1984, there were 166 males eligible for promotion to lieutenant, of whom 43 were promoted; the selection rate for males was thus 26%. Thirteen females were eligible for promotion and one was selected; the selection rate for females was 8%. Had women been promoted at the same rate as men, three women would have become lieutenants between 1979 and 1984 rather than just one.

 Standing alone, the evidence that women are virtually unrepresented above the rank of sergeant, are underrepresented in the upper ranks overall, hold a disproportionate number of positions in the lower ranks, and have a lower promotion selection rate is sufficient to convince the court that the promotion system has a disparate impact on female officers. This conclusion is reinforced by figures reflecting the representation and rank of female officers in certain of the department's individual divisions.

Male officers appear to be disproportionately assigned to the patrol division, and there was evidence that service in this division enhances an officer's chances of obtaining promotion. Of the 42 women on the force, 26% are in the patrol division. By contrast, 44% of the 335 men are in patrol. Overall, females represent only 7% of the officers in the patrol division. The court recognizes that women may serve in divisions other than patrol partly as a matter of personal preference. The court is, however, convinced that this personal preference is in substantial measure a response to, as demonstrated later in this opinion, pervasive sex discrimination in the department, and more specifically to the fact that advancement in the department is not fully open to women regardless of the division in which they serve. In other words, unlike men, women have had no incentive to serve in the patrol division.

In addition to demonstrating that females are underrepresented in a particularly significant division, the figures also indicate that even within those divisions where women are overrepresented, they hold few of the positions at the rank of sergeant or above. For example, women make up 32% of all officers in the Special Services division but hold only 10% of the upper level positions in that division. Similarly, women make up 24% of the officers in Youth Aid but again hold only 10% of the upper level positions. Given that women are so overrepresented in those two divisions, it is particularly noteworthy that they are so underrepresented in the ranks of sergeant or above.

 The court is well aware of the Supreme Court's caution that "statistics are not irrefutable; they come in infinite variety and, like any other sort of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *International Brotherhood of Teamsters,* 431 U.S. at 339–40, 97 S.Ct. at 1856–57. In this case, some of the statistical comparisons may be open to question on the grounds that they were based on relatively small samples. However, the court refuses to discount such evidence for several reasons. First, courts are more willing to rely on figures drawn from relatively small samples when they reflect sizable disparities. *See, e.g., Valentino v. United States Postal Service,* 674 F.2d 56, 72 (D.C.Cir.1982) ("small numbers are not *per se* useless, especially if the disparity shown is egregious"); *Rivera v. City of Wichita Falls,* 665 F.2d 531, 536–37 n. 7 (5th Cir.1982) (limited sample size does not preclude court from finding "a decisive pattern emerging from a history of experiences" where "the observed disparity is . . . great"). Here, the great disparity between the selection rates for the male and female officers from 1980 to 1983, the almost complete absence of women above the rank of sergeant, and the stark contrast between the proportion of male and female officers

in the upper ranks all lead the court to accept the small sample sizes.

■ Second, the small sample sizes are presumably due at least in part to the police department's prior discrimination in hiring; because of this discrimination, there simply are not that many women available to be promoted. While the court is certainly aware of the dangers of drawing inferences from small samples, it is also reluctant to allow city and police officials to profit, in effect, from past discriminatory actions. *See Boston Chapter, N.A. A.C.P., Inc. v. Beecher,* 504 F.2d 1017, 1021 (1st Cir.1974) (refusing to reject figures drawn from small sample size where small sample size is caused by employer's discriminatory recruitment practice and challenged test's tendency to deter minorities from applying for employment).

■ The third reason the court refuses to reject Pierce and Oyler's evidence on the grounds of small sample size is that they presented evidence showing not only the relative treatment of male and female officers but also the absolute impact of the promotion system on female officers. The absolute impact measure, which compares the number of females promoted to the number that would have been promoted were females selected at the same rate as males, has been recognized as a particularly useful measure where the sample size is small because it avoids the distortions that may occur when a proportion-based measure is applied to a small sample. D. Baldus & J. Cole, *Statistical Proof of Discrimination* ¶ 3.112[33]. Here, Pierce and Oyler showed that had women been promoted at the same rate as men, two women would have been promoted to sergeant between 1980 and 1982 and three women would have been promoted to lieutenant between 1979 and 1984. The court therefore concludes that Pierce and Oyler's statistical proof is sufficient to make out a prima facie case of disparate impact.

**B.**

Since Pierce and Oyler have established that the police department's subjective promotion system has a disparate impact on women, the burden now shifts to city and police officials to show that the system is necessary to the proper operation of the police department; "[t]he touchstone is business necessity." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). "If an employment practice which operates to exclude [members of a protected group] cannot be shown to be related to job performance, the practice is prohibited." *Id.* Where there is proof of disparate impact, "the employer must do more than 'articulate.' He bears the burden of proving or 'persuasion,' that the [challenged practice] was a 'business necessity.'" *Nash v. Consolidated City of Jacksonville,* 763 F.2d 1393, 1397 (11th Cir. 1985).

■ City and police officials have completely failed to shoulder their burden of establishing that the department's subjective promotion system is justified by business necessity. The Eleventh Circuit has explained that the test for business necessity is

whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any [discriminatory] impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced or accomplish it equally well with lesser differential racial impact.

*Crawford v. Western Electric Co., Inc.,* 745 F.2d 1373, 1385 (11th Cir.1984). There was no evidence whatsoever that the department's subjective system was in any way "necessary" to the safe and efficient operation of the police force. Furthermore, there was no indication that the system "carr[ies] out the business purpose it is alleged to serve." Presumably, the "business purpose" of the department's

promotion system is to identify and move up those officers who are capable of assuming increased responsibilities and possess strong supervisory abilities. However, because there are no established criteria for promoting officers and there is no system for reviewing promotion decisions, the department cannot be certain that officers actually are being promoted for their ability to supervise others or to take on more responsibility; under the present system, an officer may be promoted for virtually any reason at all, and, indeed, the evidence reflects that the promotion selection process is, at best, arbitrary, and, at worst, intentionally discriminatory against women, as shown below. If the system ever serves its stated business purpose, rest assured it has been by mere accident. Finally, given the myriad of possible methods of selecting officers for promotion, it is difficult to believe that there is no acceptable alternative to the present system that would have a less discriminatory impact.

In *Crawford*, where a subjective promotion system was challenged as being racially discriminatory, the court found that there was no business necessity for the system because it had "no written standardized criteria for supervisors to use in making evaluations of [subordinates'] qualifications, ha[d] no requirement that the rationale supporting promotional decisions be contemporaneously recorded in written form, ha[d] no requirement that supervisors keep permanent records of the quality and efficiency of each [employee's] work, and permit[ted] subjective evaluations by white foremen of black employees 'skill' in the absence of written standards or criteria." 745 F.2d at 1386. The promotion process in the City of Montgomery Police Department is nearly identical to that described in *Crawford*, except that the *Crawford* system at least had a nominal review procedure and the police department here does keep on record the semi-annual efficiency reports filed by officers' immediate supervisors; in addition, of course, rather than whites evaluating blacks, men evaluate women. Like the court in *Crawford*, this court concludes that there has been no

showing of business necessity. The court therefore finds that, in light of the promotion system's discriminatory impact on women, the system violates Title VII.

IV.

The second claim in this lawsuit is based on disparate treatment; the claim is that, in violation of Title VII and section 1983, officials of the City of Montgomery and its police department have engaged in a pattern or practice of intentional discrimination in promotions against female officers, including Pierce and Oyler.

In *International Brotherhood of Teamsters*, the Supreme Court explained that in order to prove a system-wide pattern or practice of discrimination, the employee "ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. [The employee] had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." 431 U.S. at 336, 97 S.Ct. at 1855. The evidence here firmly establishes that officials of the City of Montgomery and its police department have engaged in a pattern and practice of discriminatorily denying promotions to Pierce and Oyler and other female officers. Indeed, the evidence that follows reflects that sexism in the police department is widespread and deep-rooted, and has routinely infected the decisions of virtually all administrators and supervisors, including the mayor, the police chief, his deputy, and the division commanders.

A.

An employee may establish a pattern and practice of sex discrimination by anecdotal evidence, by showing a pattern and practice of individual instances of discrimination. *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1143 (11th Cir.1983). Pierce and Oyler have established such a pattern and practice, begin-

ning with their own individual claims of disparate treatment.

Pierce and Oyler charge that city and police officials have intentionally denied them promotions because they are women. In a Title VII or section 1983 case, where as here the evidence is circumstantial, an employee has the initial burden of establishing a prima facie case of intentional discrimination by a preponderance of evidence, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), which once established raises a presumption that the employer discriminated against the employee in employment. *Id.,* at 254, 101 S.Ct. at 1094. If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee. This may be done by the employer articulating a "legitimate, nondiscriminatory reason" for the employment decision, a reason which is "clear and reasonably specific" and worthy of credence. *Id.,* at 253, 257–258, 101 S.Ct. at 1093, 1095–96. The employer has a burden of production, not one of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *Id.,* at 254, 101 S.Ct. at 1094.

Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for intentional discrimination. The employee may satisfy this burden by persuading the court either directly that a discriminatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. *Id.,* at 256, 101 S.Ct. at 1095. By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of evidence that she

has been the victim of intentional discrimination. *Id.*

An employee may establish a prima facie case of promotion discrimination by proving that she is a member of a protected group, was qualified for and applied for the promotion, was rejected despite these qualifications, and that other employees with equal or lesser qualifications who were not members of the protected group were promoted. *Perryman,* 698 F.2d at 1142 n. 7.

Both Pierce and Oyler established prima facie cases of promotion discrimination. First, they both showed that they were qualified for the promotions they were unable to obtain. Pierce joined the police department in 1976. She was made a corporal in 1980 and has applied for a promotion to sergeant every year since then. Since 1981, Pierce has apparently had the prescribed number of years' experience for the promotion to sergeant. Furthermore, even though "an employer may not utilize wholly subjective standards to judge its employees' qualifications and then plead lack of qualification when its promotion process is challenged as discriminatory," *Crawford,* 745 F.2d at 1385, Pierce does appear to have met the subjective qualifications for promotion as well. Pierce has received the highest or second highest scores in all categories on her semi-annual efficiency reports since 1980, except for one report in 1982.[9] With the exception of the one 1982 report, the inspecting officers have always emphasized Pierce's supervisory abilities in their reports, and the reports for the second half of 1980 and the first half of 1981 explicitly recommended that Pierce be promoted. Based on this evidence, the court finds that Pierce has been qualified for promotion at least since 1981.

Oyler joined the police department in 1963 and was promoted to corporal in 1976 and sergeant in 1977. She applied for promotion to lieutenant every year since 1979

---

**9.** The inspecting officer for that report attributed the decrease in Pierce's scores on that one

report to personal difficulties Pierce had at the time.

until she left the department in 1985.[10] Like Pierce, Oyler obviously had the requisite number of years' experience to be promoted and also satisfied some of the more subjective requirements for promotion. Beginning in the second half of 1980, Oyler received the two highest possible scores in every category on her semi-annual efficiency reports. Her reports specifically commented on her strong supervisory abilities, praised her service as acting shift commander,[11] and noted that she had the most responsibility of any sergeant in her division. Despite these favorable reports, however, Oyler consistently received low ratings on the promotion register except in 1981. When Oyler was told that she might improve her ratings by transferring to other divisions, she applied for transfers on several occasions; her applications were always denied. Finally, the police chief requested that she remain in the special services division because her experience there was essential. On the basis of this evidence, the court finds that Oyler was qualified for but did not receive a promotion since at least 1981.

Pierce and Oyler showed not only that they were denied promotions for which they were qualified but also that men were promoted who had equal or lesser qualifications. Pierce and Oyler presented extensive evidence regarding the qualifications of male police officers holding their ranks who were subsequently promoted. This evidence, which included documents from personnel files as well as the semi-annual efficiency reports, permitted the court to compare Pierce's and Oyler's qualifications with those of the male officers who were promoted to sergeant and lieutenant in the years that Pierce and Oyler sought similar promotion. These comparisons show that in each of these years, male police officers whose qualifications and experience were equal to or less than those of Pierce and Oyler were promoted to sergeant and lieu-

tenant. For example, Pierce was more highly educated than virtually all of the men who were promoted to sergeant, and her semi-annual efficiency reports fall among the most highly praised. Based on these comparisons, the court finds that Pierce and Oyler have established prima facie cases of sex discrimination.

 Having determined that Pierce and Oyler made out prima facie cases of discrimination, the court must now consider whether city and police officials rebutted those cases by articulating legitimate, non-discriminatory reasons for their allegedly discriminatory actions. An employer may only use the results of a facially neutral practice to rebut an employee's prima facie case if he can show that the practice does not have an impermissible disparate impact, *Griffin*, 755 F.2d at 1528, and, of course, an employer may not use an intentionally discriminatory practice to rebut a prima facie case. The city and police officials therefore may not rely on Pierce's and Oyler's promotion ratings to rebut their prima facie cases, for, as already found by the court, these ratings are a significant component of a promotion process that has a impermissible disparate impact on women, and, as demonstrated later in this opinion, these ratings are the product of an intentionally discriminatory scheme against women.

Nevertheless, city and police officials have presented several other reasons why Pierce and Oyler were not promoted or rated more highly. According to the division commanders, Pierce had not had sufficient experience in divisions such as patrol and investigation and therefore lacked "deterrence and apprehension" skills and "command presence." In addition, Mayor Folmar explained that he did not consider promoting Pierce when her name appeared on an all-female selective certification he requested in 1983 because he had already

---

**10.** Oyler left the department in 1985 for reasons unrelated to this lawsuit.

**11.** Generally, an officer must have the rank of lieutenant to serve as a shift commander. For a

total of two years, however, Oyler served as acting shift commander of the special services division even though she was only a sergeant.

decided to promote two other women before he even requested the certification. The mayor also stated that regardless of his prior decision to promote the two other women, he would not have promoted Pierce based on his "value judgment" that she was unqualified to be a sergeant. In particular, the mayor referred to an incident in which he received a complaint that Pierce was improperly dressed in high heels and a tight black dress and had to be ordered into her uniform. The final piece of rebuttal evidence against Pierce's prima facie case was testimony from a supervisor who stated that Pierce had an "attitude problem" and introduced an efficiency report indicating that Pierce missed too much work due to illness.

The reasons presented for not promoting Oyler included her lack of experience in other divisions, comments made by her supervisor and fellow police officers that she had not performed well as a supervisor, and reports of various incidents in which Oyler received "counseling forms," which are used to notify officers of minor violations of police department regulations or procedures.

█ On the basis of this evidence, the court finds that city and police officials have satisfied their burden of articulation with respect to both Pierce and Oyler.

█ As already stated, the employer's articulation of a legitimate, non-discriminatory reason shifts to the employee the burden of proving that this reason is pretextual. Of the several reasons offered by city and police officials for the department's refusal to promote Pierce, none is worthy of credence. The first reason presented was that Pierce lacked sufficient experience in the patrol and investigation divisions and therefore lacked deterrence and apprehension skills and command presence. However, Pierce is not devoid of experience in the patrol and investigation divisions; she actually served in the patrol division at one time, and as an investigator in the youth aid division, she performed duties that were later transferred to the investigation division. Pierce's comparative evidence showed that several men with similar experience in these two divisions received promotions in the years Pierce unsuccessfully applied. Furthermore, the court does not find credible the commanders' negative evaluations of Pierce's command presence and deterrence and apprehension skills. The court is convinced that Pierce had these qualities. Indeed, the court is convinced, for reasons that follow, that the division commanders' evaluations of Pierce were for the most part substantially tainted by a sexist bias.

The city and police officials' second reason for not promoting Pierce was that an efficiency report mentioned that she had an attitude problem. However, it is difficult to understand how a single report covering one six-month period could justify the department's failure to promote Pierce since 1981. Indeed, the report commenting on Pierce's supposed attitude problem was not filed until after Pierce intervened as a plaintiff in this cause, and Pierce's reports in previous years had all been quite favorable. The court therefore rejects as pretextual this reason for Pierce's failure to be promoted as well.

The third reason given for not promoting Pierce is that at least in 1983, Mayor Folmar had decided to promote two other women before he even received the selective certification that listed Pierce's name. At best, this rationale only explains why Pierce was not promoted in 1983; it does nothing to explain the department's failure to promote her in 1981, 1982, 1984, and 1985. Furthermore, the mayor's claim that he had already chosen two other women does not explain why the division commanders gave Pierce lower ratings than men with apparently equal or poorer semiannual efficiency reports and qualifications, thereby decreasing her chances of promotion in any given year. The mayor's explanation simply does not satisfy the court as a justification for the failure to promote Pierce for the entire period since 1981.

Having examined the reasons proffered for the failure to promote Pierce and con-

sidered certain comparative evidence, the court concludes that the reasons given are all pretextual. This conclusion is supported by the statistical evidence previously discussed. *See Miles,* 750 F.2d at 873 (statistical evidence showing that employer has a pattern of favoring white employees over black employees supports an individual claim of disparate treatment).

■■■ The reasons proffered for Oyler's failure to obtain promotion are also pretextual. The first reason presented was that Oyler lacked experience in divisions other than special services. However, Oyler served in both the traffic and patrol divisions, and she frequently sought transfers to other divisions to gain the experience she supposedly lacked. Particularly given that there is no objective standard for how much experience in which different divisions one must have in order to be promoted to lieutenant, the court finds the claim that Oyler lacked experience to be a mere pretext.

The second reason proffered for Oyler's failure to obtain promotion is that certain supervisors and fellow officers were critical of her job performance. The only evidence of such criticisms was the testimony of various witnesses at the trial, however, and thus there is no evidence that the critical evaluations actually played a role in the promotion decisions; the criticisms of Oyler's work were all made after the fact, when Oyler's participation in this lawsuit colored the assessments of her performance. Furthermore, Oyler's semi-annual efficiency reports, which are contemporaneous evaluations of job performance, were generally quite favorable and thus provide a strong contrast to these after-the-fact criticisms. In fact, a division commander who criticized Oyler at the trial had previously reviewed a favorable report on Oyler and overwhelmingly agreed that she deserved the high marks she had received; the commander's only point of difference

with the report was that he felt her rating for "loyalty" was somewhat too high. Given that there is no evidence showing that the criticisms offered at trial were even taken into account in making the promotion decisions and that the contemporaneous efficiency reports are in any case more likely to be accurate, the court finds that city and police officials' contention that Oyler was denied promotion because of her poor performance to be unworthy of credence.

The final reason presented for the failure to promote Oyler is that she had received several counseling forms criticizing her for small infractions of department rules and other minor matters.[12] As was the case with the criticisms made at trial, however, it is unlikely that the counseling forms played any part in the promotion decisions. The department keeps copies of any counseling forms an officer receives in his or her personnel file, but the evidence showed that division commanders rarely if ever consult the personnel files when rating officers for promotion. In evaluating Oyler, therefore, the division commanders probably did not even know that she received any counseling forms, and more than likely had not seen the forms themselves. The court therefore finds it unlikely that Oyler was denied promotion on the basis of these forms.

Even if the division commanders did know of and did see the forms, however, the court still rejects the possibility that they were the basis for the denials of promotion. First, although the counseling forms presented as evidence all concentrated on a relatively brief period of time in late 1979 and 1980, Oyler was denied promotion through 1984. Furthermore, her efficiency reports for 1979 and 1980 indicated that her performance was more than adequate.

Finally, the criticisms in the reports were all quite minor, focusing primarily on Oyler's failure to complete certain paperwork

---

**12.** The police department uses counseling forms to remedy routine or minor deviations from departmental procedure or regulations. Copies of these forms are given to the police officer involved and placed in his or her personnel file; they do not lead to further disciplinary proceedings.

in a timely fashion. Compared to some of the conduct for which men who were later promoted were disciplined, Oyler's misconduct seems insignificant. For example, a male officer who was actually suspended from service for neglect of duty was promoted to sergeant approximately two years' later and subsequently promoted to lieutenant. This same officer was also reprimanded for involvement in an accident with a police vehicle about one year before he became a sergeant. Another male officer was penalized a total of five compensatory days in 1974 ad 1975 for misconduct involving use of police vehicles and then promoted to sergeant in 1976. A final example is a male officer who was promoted to sergeant and then to lieutenant after having received a counseling form for drinking on duty. In light of this evidence, Oyler's tardiness in completing paperwork hardly strikes the court as sufficient to keep her from being promoted.

The court therefore concludes that all of the reasons given for the failure to promote Oyler were pretextual. The court is particularly reluctant to credit city and police officials' contention that Oyler was insufficiently qualified or experienced for promotion, in light of Oyler's two years of service as shift commander, a position generally held by lieutenants. Of course, the court's conclusion that the proffered reasons are pretextual is again supported by the statistical evidence previously discussed.

Because both Pierce and Oyler have established that the reasons proffered for their failure to be promoted were not worthy of credence, the court finds that they have both been victims of intentional sex discrimination and are entitled to relief on their individual claims of disparate treatment under Title VII and section 1983.

### B.

Pierce and Oyler also provided anecdotal evidence of a sexually discriminatory atmosphere within the police department. They presented evidence showing that male supervisory officers, including the division commanders who play such a significant role in promotion and assignment decisions, regularly engaged in verbal sexual harassment of female officers and held sexually-biased attitudes.

For example, Pierce and Oyler presented evidence that a supervisor asked a female job applicant, who had been raped, how she could expect to fend off suspects and attackers if she could not fend off her rapist. On another occasion an officer referred to a black female applicant as "pretty enough to live in the big house." Oyler herself recounted that, when she sought training to improve herself, she was denied the training and told that "the men will take care of you." And other evidence reflected how women more than men were asked to perform stereotypical duties, such as clerical work and juvenile work.

Finally and perhaps most significantly, at the division commanders' meetings to consider applications to the police department, one commander commented that a female officer's decision to have an abortion showed why women should not be police officers, while another commander, supposedly in a joking manner, regularly voiced his disapproval of having women serve as police officers.[13] The court is convinced that, while the remarks may have been made in a joking manner, they revealed the true feelings and attitudes of department officials.

 The court is convinced that discriminating against women because they are women was and remains the "standard operating procedure" within the City of Montgomery Police Department.

### C.

Pierce and Oyler's anecdotal evidence also demonstrated that female officers encountered not only sexual harassment and hostility, they were unjustifiably barred altogether from some of the most coveted

---

**13.** Although this evidence specifically concerns hiring decisions rather than promotions, it obviously helps illuminate the department's general attitude towards female officers.

positions because of their sex. Every year, two junior officers serve as aides to Mayor Folmar. Officers may not apply to be mayoral aides; rather, the mayor simply selects the aides based on his own observations and knowledge of the younger officers. The aides' duties range from protecting the mayor when he is outside his home to helping arrange the mayor's public appearances. Throughout their two-year terms, the aides have considerable personal contact with the mayor. This contact is quite helpful to the aides' future advancement in the police department, of course, for it is the mayor who has the final say on who to promote and his personal knowledge of the candidates plays a significant role in his decisions. Indeed, of the three officers recently named to the positions of chief of police and deputy chief of police, two had served as mayoral aides.

No woman has ever served as a mayoral aide. This complete exclusion of all women from a position may be justified only on the grounds of a bona fide occupational qualification (BFOQ), which only excuses such discrimination "when the employer can show that the excluded class is unable to perform the duties that constitute the essence of the job, duties that Title VII defines as 'necessary to the normal operation of the particular business or enterprise.' 42 U.S.C.A. § 2000e–2(e)." *Hayes v. Shelby Memorial Hospital,* 726 F.2d 1543, 1549 (11th Cir.1984). According to the mayor, his only reason for refusing to select a female officer for the position of mayoral

aide is that his wife believes "it would not look right" for him to have female aides. The mayor testified that he has observed female officers he would select "in a minute," but that his wife "put [her] foot down." Evidently, the mayor believes that women are capable of performing the necessary job duties, and thus the BFOQ defense is unavailable; the personal preferences of the mayor's wife simply are not a reasonable or sufficient justification for discriminating against female officers.[14]

The court therefore concludes that the mayor's practice of selecting only male officers to serve as his aides unjustifiably discriminates against women and is further evidence in support of Pierce and Oyler's pattern and practice claim. Indeed, the court is convinced that Mayor Folmar's refusal to appoint female aides merely because of appearances connotes a broad and deep-seated discriminatory attitude toward women in employment, which surely has infected all his employment decisions. This conclusion, in conjunction with the fact that Folmar has personally made all the promotions challenged in this lawsuit, further convinces the court that sex discrimination was more than likely a significant factor in all such promotions.[15]

### D.

Pierce and Oyler also correctly point out that their pattern and practice claim is buttressed by evidence that there is ample opportunity for discrimination in

14. Admittedly, there was some testimony from other witnesses that women could not serve as aides because aides must accompany the mayor into bathrooms and locker rooms and women were physically unable to perform all of an aide's duties. However, the mayor himself did not rely on these reasons, and it is the mayor who selects the aides.

15. The court cannot overlook that many of the witnesses who testified in favor of the conduct of the mayor and the police department were women. Surely, the defense in this case intended that the court be impressed with this fact. The court is not persuaded, however, that this fact warrants any contrary conclusions in this lawsuit. This court would have to be truly naive to assume that women cannot sexually

discriminate against women and that many women do not harbor stereotypical, limited views of themselves. In *Buskey v. Oliver,* 565 F.Supp. 1473, 1484 (M.D.Ala.1983), this court rejected such a naive view of race discrimination. This court now similarly rejects such a naive view of sex discrimination. As the Supreme Court observed in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), which concerned alleged racial discrimination in the selection of grand juries,

Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.
430 U.S. at 499, 97 S.Ct. at 1282.

the promotion process. *Payne*, 673 F.2d at 817 (evidence of opportunity to discriminate may also support claim of pattern and practice). In light of the extremely subjective nature of the promotion decisions and the fact that there is no means by which to appeal these decisions, the court must agree that such opportunity exists.

### E.

■ Finally, the statistical evidence, already discussed, reinforces the court's finding, based on anecdotal evidence, of a pattern and practice of intentional discrimination. In fact, statistical evidence alone may be sufficient to establish a prima facie case of a pattern of discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Kilgo v. Bowman Transportation Co.*, 789 F.2d 859, 874 (11th Cir.1986). The statistical evidence here—in particular, that women are virtually unrepresented above the rank of sergeant, are underrepresented in the upper ranks overall, hold a disproportionate number of positions in the lower ranks, and have a lower promotion selection rate—strongly reflects that female officers in the department have been the victims of sex discrimination.[16] *See Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 192 (5th Cir.1983) (where employer promotes from within using completely subjective system, "the percentage of black employees in the upper level positions should correspond to the percentage of black employees in the workforce as a whole if no discrimination is taking place").[17]

### V.

■ The final claim before the court is Pierce's claim of retaliation. Retaliation claims are analyzed in the same way as disparate treatment claims. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986). Thus, since Pierce has relied on circumstantial evidence, the court must apply the analysis outlined in *Texas Department of Community Affairs v. Burdine*, *supra*.

### A.

■ A prima facie case of retaliation consists of proof: (1) that the employee engaged in action protected by Title VII; (2) that the employee suffered an adverse employment decision; and (3) that there is a causal link between the protected action and the adverse employment decision. *Donnellon*, 794 F.2d at 600–01. Here, Pierce clearly engaged in protected action by filing charges of discrimination with the EEOC and by filing her complaint-in-intervention in this cause. Any dispute therefore concerns whether Pierce suffered an adverse employment decision and, if so, whether there was a causal link between the protected actions and the adverse decision.

■ The court finds that Pierce suffered at least two adverse employment decisions. First, in February 1983, the mayor requested and received a selective certification of women police officers to consider for promotion to sergeant. Pierce's name was on the certification, but the mayor promoted two other women. This was an employment decision adverse to Pierce. Second, Pierce was rated 45 on the 1983

---

**16.** At trial, in an effort to respond to Pierce and Oyler's evidence, city and police officials presented testimony that so lacked merit on its face that a rebuttal from Pierce and Oyler was not warranted. For example, one of the department's witnesses, who was a former employee, testified that women could not generally perform as well as men because they suffered from hormonal fluctuations related to the female menstrual cycle. And the police chief himself testified that a woman should not serve as the mayor's aide because a woman could not "run through ditches" and physically keep up with the mayor. That city and police officials offered this obviously sexist testimony in defense of their discriminatory conduct shows just how deep-seated sexism is in the department.

**17.** In concluding that Pierce and Oyler have established a pattern and practice of sex discrimination, including their own individual claims of disparate treatment, the court has relied on statistical data. The court would have reached these same conclusions without the statistical data.

register of applicants for promotion to sergeant, and 144 on the 1984 register. In the previous three years, by contrast, she had been rated 26, 19, and 32. Pierce contends that her noticeably poorer ratings in 1983 and 1984 were an adverse employment decision. The court agrees and so finds. Pierce has therefore established that she suffered adverse employment decisions.

■ Courts have recognized several ways in which to establish the third step of a prima facie retaliation, which is the causal link between the protected action and the adverse employment decision. These include a change in the employer's conduct, the proximity of the adverse employment decision to the protected action, and the employer's efforts to conceal its conduct. *See* B. Schlei & P. Grossman, *Employment Discrimination Law*, Ch. 15 (2d ed.) at 558–560.

■ Because of the proximity in time between Pierce's protected actions and the employment decisions adverse to her, the court finds that the necessary causal link exists with respect to both of the adverse employment decisions Pierce suffered. Pierce filed two EEOC charges of discrimination against the police department, one in late 1982 and the other in early 1983, and she filed her complaint-in-intervention in this lawsuit in late 1983. The mayor's decision to elevate two women other than Pierce occurred in 1983, just after Pierce alleged that the department discriminated on the basis of sex. The mayor never explained precisely why he preferred the two other women, but the timing of the mayor's decision leads the court to conclude that the mayor was motivated by a desire to retaliate against Pierce.

■ The court also finds a causal link between Pierce's protected actions and the decline in her ratings. The 1983 register for promotion was compiled shortly after Pierce filed charges with the EEOC, while the 1984 register was compiled after she intervened as a plaintiff in this suit. On both registers, Pierce was rated considerably lower than she had been in previous years. The proximity of the decline in her ratings to her protected actions indicates a causal link.

The court's finding of a causal link is supported by the fact that unlike her register ratings, Pierce's semi-annual efficiency reports did not show any significant change in 1983 and 1984. The numerical ratings in the efficiency reports remained high, and there were only general references in written remarks to Pierce's "frequent illness" and "attitude problem." Since these reports are prepared by direct supervisors, they tend to reflect a police officer's performance more accurately than promotion ratings. Pierce's actual performance thus appears to have remained strong, which increases the likelihood that the drop in her register ratings was caused by her decision to file charges of discrimination rather than legitimate doubts about her qualifications.

### B.

Since Pierce has established a prima facie case of retaliation, the court must consider whether officials of the City of Montgomery and its police department have articulated legitimate, nondiscriminatory reasons for the employment decisions adverse to Pierce. *Donnellon,* 794 F.2d at 601. City and police officials have explained that Pierce was not promoted in February 1984 because the mayor had already decided to promote two other women when he requested the selective certification. However, the officials offered little explanation for the precipitous decline in Pierce's promotion ratings in 1983 and 1984. The division commanders did suggest reasons for not promoting Pierce but did not indicate that these reasons changed in any way in these years. The only suggestion of a change in Pierce's performance that might arguably justify the sudden decline in her ratings was the mention of her "frequent illnesses" and "attitude problem." Although the court has strong doubts whether such mention satisfies even the exceedingly light burden of articulation, the court will nonetheless focus directly on the ques-

tion of discrimination. *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 717–18, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983).

### C.

The final step of the *Burdine* analysis of retaliation requires the court to inquire whether an employer's stated reasons for the employment decision were mere pretext.

■ The court finds that Pierce did suffer retaliation with regard to the mayor's failure to promote her in February 1984. The mayor states that he had made a "value judgment" that Pierce should not be promoted, but the court is convinced that this judgment sprang from retaliatory motives. The court is convinced that the promotion of the two women to sergeant was triggered by Pierce's charges of sex discrimination; the mayor's request that only women be certified was but a belated effort to coverup past discriminatory acts. The two women selected, however, were strong supporters of the mayor and the department in their opposition to Pierce's charges of discrimination. These women—who were no more qualified than Pierce, if not less qualified—were selected over Pierce because they did not challenge the status quo and were "loyal" to the department. The court is firmly convinced that, in his efforts to promote more women in the wake of Pierce's charges, the mayor would have also promoted Pierce but for her "disloyal" conduct.

■ The court also finds that Pierce suffered retaliation with regard to the 1983 decline in her promotion ratings. While the explanation presented for the decline

was scant at best, the evidence was considerable that Pierce's performance did not change in 1983 and 1984 comparably with the decline in her ratings. A finding of retaliation is therefore unavoidable.[18]

### VI.

Pierce, Oyler, and the class of female officers they represent are unquestionably entitled to relief for the sex discrimination they have suffered; and Pierce is entitled to relief for the impermissible retaliation she suffered.

### A.

Because the police department's existing promotion system has been found to discriminate against female officers, it must be changed or replaced.[19] On the basis of the record as it now stands, the court is unable to determine precisely how the promotion system should be altered so as to eliminate the opportunities for discrimination that currently exist. In any case, however, the court believes that, at least as an initial matter, the parties themselves are in the best position to develop a new system. The court will therefore initially require that the parties attempt to agree on new promotion procedures that will not violate Title VII and section 1983. Of course, if the parties are unable to agree upon suitable changes in the promotion system or if the court declines to approve any such agreement under Fed.R.Civ.P. 23(e), the court will itself refashion the system after the parties submit relevant evidence.

Department officials will also be enjoined from making any "permanent" promotions, until such time as the new promotion system is in place. If the police department

---

**18.** Indeed, the two acts of retaliation collapse in part into one. Admittedly, Pierce placed third on the all-female register, and the two higher women were selected by the mayor. The court is convinced that but for the mayor and the police department's efforts to reward women who were clearly "loyal" and to the lower ratings of Pierce who was "disloyal," Pierce could very well have been first on the certification.

Nevertheless, the evidence does not reflect that the mayor always selects the highest person

on a certification; indeed, the mayor does not argue this. The court is therefore also convinced that, but for her disloyatly, the mayor would have selected Pierce, even though she was third on the certification.

**19.** Since training, initial assignments, and transfers played a critical role in the promotion system, these must also be refashioned, as a part of the promotion system, not to discriminate against women.

finds it necessary to make emergency promotions, it may do so with the understanding that any such promotions will be reviewed under the new system as soon as it becomes effective.[20]

### B.

The court will also give the parties an opportunity to agree upon backpay, frontpay, retroactive promotions, changes in promotion ratings, and other remedial benefits for Pierce and Oyler. If the parties are unable to agree on such, the court will then fashion such relief.

The court will also allow the parties an opportunity to agree upon appropriate individual relief for all other class members. If the parties are unable to agree to such relief or if the court declines to approve any such agreement under Fed.R.Civ.P. 23(e), the court will then fashion a procedure to determine which class members are entitled to relief and to what individual relief they are entitled.

Finally, the court will award counsel for Pierce and Oyler reasonable attorney fees and expenses for this phase of the litigation, 42 U.S.C.A. §§ 1988, 2000e–5(k). Any fee and expense request filed by Pierce and Oyler should address each of the criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

An appropriate judgment will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiff-intervenors Sandra M. Pierce and Joyce S. Oyler, individually and on behalf of the class they represent, and against the defendants;

(2) That the defendants are ENJOINED and RESTRAINED from failing to restructure the promotion system of the City of Montgomery Police Department so that the system does not discriminate against female police officers;

(3) That the defendants are ENJOINED and RESTRAINED from making any promotions, other than temporary ones, to the positions of police chief, deputy chief, major, captain, lieutenant, and sergeant in the City of Montgomery Police Department, until further order of the court;

(4) That the defendants are ENJOINED and RESTRAINED from failing to give the plaintiff-intervenors and the plaintiff class they represent such individual remedial relief as may be appropriate;

(5) That counsel for all parties are DIRECTED to meet with each other within 21 days from the date of this judgment to attempt to resolve all, or as many as possible, of the issues raised by the following:

 (a) Restructuring the promotion system of the City of Montgomery Police Department; and

 (b) Individual remedial relief for the plaintiff-intervenors and the members of the class they represent;

(6) That plaintiff-intervenors Sandra M. Pierce and Joyce S. Oyler are allowed 28 days from the date of this judgment to file a request for the court to resolve those issues raised in paragraph 5 that the parties are unable to resolve among themselves; and

(7) That the plaintiff-intervenors are allowed 28 days from the date of this judgment to file their request for attorney fees and expenses, which request should address each of the criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

### ORDER AND INJUNCTION

On November 17, 1986, this court issued a memorandum opinion finding that officials of the City of Montgomery and its police department had engaged in a pattern and practice of denying promotions to

---

**20.** The court previously entered a preliminary injunction which, in effect, allowed the police department to make only temporary promotions. The court is merely continuing that preliminary injunction.

women merely because they are women. The court also found that these officials retaliated against plaintiff-intervenor Sandra M. Pierce for bringing the charges of sex discrimination that led to the court's findings.

In *Lewis v. Smith*, 731 F.2d 1535, 1540 (11th Cir.1984), the Eleventh Circuit Court of Appeals instructed district courts that, where there is abundant evidence of consistent past discrimination, injunctive relief prohibiting such discrimination is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law. This court sees no need now to issue a broad injunction prohibiting officials of the city and its police department from discriminating against women because such an injunction was already issued by this court at the end of the first phase of this lawsuit, on March 12, 1976, and that injunction is still in full force and effect.

The evidence at trial was also abundant that city and police officials have repeatedly engaged in retaliation against plaintiff-intervenor Pierce for having brought charges of sex discrimination, and the court is convinced that there is a strong probability of further retaliation against her. Since there is not already outstanding in this lawsuit an injunction banning such retaliation, the court is now compelled to issue such an injunction.[1] *See Lewis v. Smith, supra.* The injunction will prohibit officials of the City of Montgomery and its police department from retaliating against Pierce and any other person who files a charge of sex discrimination, and the injunction will require that these officials give Pierce, in whatever departmental position she may hold now and in the future,

the same respect, support and encouragement given to all other officers.[2] The court is of the opinion that this injunction should reach not only the present defendants in this lawsuit—that is, the mayor and police chief—but also all majors, captains, lieutenants, sergeants, corporals, and investigators in the police department, and anyone else who receives notice of the injunction. *See* Fed.R.Civ.P. 65(d). Thus, virtually any member of the department who violates the injunction will be subject to punishment for both civil and criminal contempt.

In accordance with the memorandum opinion entered on November 17, 1986, it is therefore the ORDER, JUDGMENT, and DECREE of the court:

(1) That the Mayor of the City of Montgomery, the Chief and Deputy Chief of Police of the City of Montgomery Police Department, all majors, captains, lieutenants, sergeants, corporals, and investigators within the police department, and their agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order and injunction by personal service or otherwise, are each ENJOINED and RESTRAINED as follows:

(a) from in any way retaliating against plaintiff-intervenor Sandra M. Pierce or any other person for bringing charges of sex discrimination against the City of Montgomery Police Department; and

(b) from failing to give plaintiff-intervenor Pierce, in whatever departmental position she may hold now and in the future, such respect, support and encouragement as is given all other officers in the police department;

(2) That the U.S. Marshall is DIRECTED to serve personally a copy of this order and

---

1. While the evidence at trial clearly warranted such an injunction, the court did not issue it because Pierce did not specifically ask for it. Pierce has now sought such relief.

2. It is ironic that the police department commanders criticized Pierce for lacking "presence" and strength of character. In her unfailing commitment to the rule of law, she has withstood the indignity of discrimination and retaliation from many, if not all, directions within the police department; she has often had to stand alone, often strenuously opposed by her fellow female as well as male officers. From this fact, as well as the other evidence presented at trial, this court is convinced that, whatever shortcomings there may be in Pierce's character, lack of "presence" and strength of character is not one of them.

injunction on the Mayor of the City of Montgomery, the Chief and Deputy Chief of Police of the City of Montgomery Police Department and on all majors within the police department; and

(3) That the Chief of Police of the City of Montgomery Police Department is DIRECTED to furnish forthwith notice of this order and injunction to all captains, lieutenants, sergeants, corporals, and investigators within the police department.