Carolyn JORDAN, etc., et al., Plaintiffs,

Sandra M. Pierce and Joyce S. Oyler, Plaintiff-Intervenors,

v.

John WILSON, etc., et al., Defendants.

Civ. A. No. 75–19–N.

United States District Court, M.D. Alabama, N.D.

May 20, 1987.

Morris S. Dees, Jr., J. Richard Cohen,
Southern Poverty Law Center, Ira Burnim,

M. Wayne Sabel, Montgomery, Ala., for Pierce & Oyler.

Robert C. Black, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for all defendants except Wade L. Moss and Montgomery City-County Personnel Bd.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Wade L. Moss and Montgomery City-County Personnel Bd.

Gregory B. Stein, Blacksher, Menefee & Stein, Mobile, Ala., for plaintiffs and plaintiff-intervenors.

## ORDER

MYRON H. THOMPSON, District Judge.

In this class-action lawsuit, two female police officers successfully challenged the promotion procedures of the Police Department of the City of Montgomery, Alabama as, among other things, sexually discriminatory in violation of 42 U.S.C.A. § 1983 and 42 U.S.C.A. §§ 2000e through 2000e–17 (otherwise known as Title VII of the Civil Rights Act of 1964, as amended). *Jordan v. Wilson,* 649 F.Supp. 1038 (M.D.Ala. 1986). This lawsuit is again before the court on a request filed by one of the two female officers that the court hold the city's mayor and police chief in civil contempt for violating one of the remedial orders of the court. For reasons that follow, the court concludes that the request should be granted.

## I.

The latest phase of the proceedings in this lawsuit was initiated when two female police officers, plaintiff-intervenors Sandra M. Pierce and Joyce S. Oyler, filed complaints-in-intervention in 1983 and 1984, charging that officials of the City of Montgomery and its police department had denied promotions to female officers because of their sex and had retaliated against Pierce for filing charges of discrimination against the department. On November 17, 1986, after a full-blown nonjury trial, the court issued an opinion and order finding that the promotion system used by the

city's police department had an impermissible "adverse impact" on female police officers in the department. The court also found that officials of the city and its police department, including the mayor of the city, had intentionally denied promotions to female officers because of their sex and had intentionally retaliated against one of the plaintiff-intervenors, Sandra M. Pierce, for having initiated the charges that resulted in these proceedings. *Jordan, supra.* The court, however, declined to fashion individual relief for the two female officers who initiated these proceedings and, instead, allowed the parties a period of time to resolve the relief issue. *Id.,* at 1063.

In reaching its findings of retaliation, the court observed that the mayor of the city, Emory Folmar, is "directly, personally, and intimately involved in the day-to-day operations of the department, so much so that his relationship with the department is more that of a 'super-chief of police.'" *Jordan,* at 1058. The court then revealed how the mayor had embarked on a department-wide scheme, principally effected by intimidation, to achieve two aims: first, to discredit, embarrass, and punish Pierce for having brought discrimination charges against him and the department; and, second, to rally others in the department to join him in his scheme to punish her and to oppose her lawsuit. At the behest of the mayor, Pierce's supervisors suddenly began to give her extremely poor ratings, with the result that her drop on the promotion register was precipitous and dramatic, and obvious to all in the department. *Id.,* at 1060–62. The scheme was thus open, notorious, and widespread so that everyone in the department would see that the penalty for "disloyalty" was great.

The scheme, however, was not based solely on intimidation. On one occasion, the mayor rewarded two female officers for supporting him against Pierce, by promoting them while rejecting Pierce. As the court previously observed:

> The two women selected, however, were strong supporters of the mayor and the department in their opposition to Pierce's charges of discrimination. These wom-

en—who were no more qualified than Pierce, if not less qualified—were selected over Pierce because they did not challenge the status quo and were "loyal" to the department. The court is firmly convinced that, in his efforts to promote more women in the wake of Pierce's charges, the mayor would have also promoted Pierce but for her "disloyal" conduct.

*Jordan I*, at 1062. The evidence was thus clear that the mayor harbored a deep dislike for Pierce and would go to great lengths to retaliate against her and to display his retaliation to others in the department.

However, even though the scheme to retaliate against Pierce was widespread in the police department and was rooted in strong feelings of dislike for Pierce, the court did not immediately issue an injunction barring future retaliation against Pierce. Instead, the court decided to confer first with the attorneys to discuss whether the injunction was really needed. The court expected that, in the wake of its November 17 opinion and order, the mayor, police chief and others would make public statements critical of the court's decision; indeed, these officials were constitutionally entitled to voice such criticisms. The court, however, hoped that shortly thereafter the mayor would put behind him all his personal animosity for Pierce and would try, in good faith, to undue his scheme of retaliation and to eliminate any present-day adverse effects of the scheme; the court hoped that the past atmosphere of retaliation, in which Pierce was unjustifiably demeaned and demoralized before her fellow officers, would be replaced with a new atmosphere, in which she would receive the same respect, support and encouragement all other officers in the department received. And the court's concern was not only for Pierce but for all female police officers in the department, and in particular for those class members who might consider filing individual claims of discrimination against the department during "stage two" of this class-action lawsuit. This court, as well as the parties, has the responsibility of assuring that class members are able to file their claims freely and openly, without even a threat of retaliation.

When the court met with the attorneys for all parties, Pierce's attorney said he and his client were still concerned that she and anyone else who might bring charges of discrimination would continue to be victims of retaliation in the department, and he asked that the court issue an injunction barring any future retaliation. In light of the evidence in this case, Pierce was clearly entitled by law to such an injunction. *Jordan*, at 1064. Therefore, on November 25, the court issued an injunction prohibiting the mayor and all officers within the police department "from in any way retaliating against ... Pierce or any other person for bringing charges of sex discrimination against the City of Montgomery Police Department;" and, more specifically, the order required that the mayor and the department "give ... Pierce, in whatever department position she may hold now and in the future, such *respect, support and encouragement* as is given all other officers in the police department." *Id.* (emphasis added). Furthermore, because his scheme to retaliate was so widespread in the police department, the court had the U.S. Marshal serve copies of the injunction on not only the mayor and police chief, who were parties to the litigation, but also on the deputy chief of police and all majors in the department; the court also had the chief of police give notice of the injunction to everyone else in the department. *Id.*, at 1064–65. The court intended that notice of the injunction cover the same expanse as the mayor's scheme to retaliate. There was no appeal of the November 17 and 25 orders.

Approximately a month and a half later, when one would have expected that the mayor and police chief would be well on their way toward creating a new atmosphere in which they and all other officers were giving Pierce the respect, support, and encouragement she deserved, the mayor and police chief lashed out at Pierce, publicly discrediting and embarrassing her before her fellow officers and before the public she serves. After signing an agreement with the other parties that Pierce was to be promoted to captain and was to receive other agreed upon relief as a result of

this litigation, the mayor stated to the press, "No, I don't think she's competent to be a captain," and "the only person who thinks she's qualified to be a captain is Judge Thompson, and he has no responsibility for her actions." The police chief, John Wilson, also stated to the press: "Who is going to be responsible for her misjudgments and actions? Is it going to be to be Judge Thompson? No. It will be me. I will be legally responsible for what she does..... If we sneeze in front of her she'll be back in Federal Court."

Without question, with these statements, Pierce's ability to function as an effective police officer within the department as well as before the public was severely damaged. These statements came not from observers outside the department, but from the two men primarily responsible for the day-to-day operations of the department, the men to whom the public and everyone in the department look for the last word on the operations of the department.

As expected, Pierce immediately filed a request to have the mayor and police chief cited for civil contempt for failing to give her the "respect, support and encouragement" given other officers. According to Pierce, the statements were merely a continuance of the mayor's open and notorious scheme to discredit and embarrass her before her fellow officers and the public, and thereby to undermine and punish her and make her an example of what could happen to other women who might consider following in her footsteps, and in particular to those women who might consider filing individual claims of discrimination in stage two of this lawsuit.

## II.

Civil contempt proceedings may be invoked "for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). Here, Pierce seeks the latter only, to have the city and its mayor and police chief compensate her for losses sustained; she has thus properly invoked these civil contempt proceedings.

■ A court may hold a person in civil contempt and impose an appropriate damage award only if the person has received fair notice of the conduct prohibited or required by the order, he has nonetheless failed to comply with the court order, and the proof of noncompliance is clear and convincing. *Newman v. Graddick,* 740 F.2d 1513, 1528 (11th Cir.1984). Good faith and the absence of willfulness are not excuses for noncompliance. *Id.* These requirements are met here. On November 25, 1986, this court issued an injunction, first, expressly prohibiting the mayor and police chief from retaliating against Pierce and, second, expressly requiring that they give Pierce the same "respect, support and encouragement" given other officers; and the U.S. Marshal had one of his deputies personally served a copy of the injunction on the mayor and police chief. The mayor and police chief were not only expressly prohibited from treating Pierce as she had been treated in the past, they were also under an affirmative duty to treat her in a specific way in the future. They therefore had fair notice of both the conduct prohibited and the conduct required by the November 25 order. The mayor and police chief nevertheless engaged in conduct that clearly violated the order.

First of all, the evidence is clear and convincing to the court that the statements they made had both the purpose and effect of retaliating against Pierce. The court agrees with Pierce that the statements were specifically intended and, in fact, had the effect of demeaning her before her fellow officers and the public, as well as demoralizing her, so as to substantially impair her ability to function as an officer. The statements were a continuation of the scheme previously condemned and prohibited by the court. Just as Pierce was about to assume a new rank with new duties and responsibilities, the mayor and police chief lashed out at her, knowing that what they said would have a direct and substantial adverse effect on how those within the department treated Pierce in her new position. The court is firmly convinced that, while the forum was public, the intent and effect were to further their private vendetta against Pierce.

Secondly, the statements made by the mayor and police chief simply cannot be reconciled with the affirmative duty this court placed on them to treat Pierce the same as all other officers. Rather than showing "respect, support and encouragement," the statements were "disrespectful," "undermining," and "demoralizing." In fact, the police chief admitted at the civil contempt hearing that he and the mayor had failed to show Pierce the respect required by the November 25 order:

COURT: .... Do police officers within the department generally show respect for each other by calling each other incompetent?

POLICE CHIEF WILSON: No, Sir, they wouldn't show respect for each other in that light, no, sir.

The mayor's and the police chief's failure to meet their affirmative duty under the order was clear and convincing.

█ The mayor and police chief retort that their statements are protected by the first amendment and that, as a result, to the extent the November 25 order prohibits them from making such statements it is constitutionally invalid. This court cannot entertain this argument. The mayor and the police chief did not appeal the November 25 order and thus any attack on it now is barred by res judicata; a party in a contempt proceeding may not attack the underlying permanent injunction that is the basis for the alleged contempt as long as the party had a chance to challenge the injunction initially. As the Supreme Court observed in *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948):

It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience.

*See also United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1551–52, 75 L.Ed.2d 521 (1983).

· Nevertheless, to provide a complete record the court would add that, even if the mayor and police chief could attack the court's November 25 order, their attack would be fruitless; the order's prohibition of the statements at issue would withstand constitutional challenge. To be sure, employers enjoy first amendment rights just as do employees. *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 617–19, 89 S.Ct. 1918, 1941–42, 23 L.Ed.2d 547 (1969). However, as with employees, not all statements made by an employer are constitutionally protected. For example, fraudulent statements, libelous statements, and obscene statements are not protected. But more to the point, statements that amount to "conduct" may be regulated and prohibited under certain employment circumstances. For example, statements by an employer that contain "threats of reprisal or force or promise of benefits" may constitute an unfair labor practice and be prohibited under § 8(c) of the National Labor Relations Act. 29 U.S.C.A. 158(c). *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. at 616–18, 89 S.Ct. and 1941–42.

And more recently, the Supreme Court wrote that under Title VII "verbal ... conduct of a sexual nature" may be prohibited if it "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Savings Bank v. Vinson*, —— U.S. ——, ——, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), *quoting* 29 C.F.R. § 1604.11. The Court explained that "sexual harassment" resulting from such conduct "which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality." *Id.*, at ——, 106 S.Ct. at 2406, *quoting Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir.1982). The Court emphasized that its conclusions regarding sexual and racial harassment were based on the fact that the reach of Title VII's prohibition against discrimination is broad, covering all "terms, conditions, or privileges of employment," 42 U.S.C.A. § 2000e–2(a)(1), and

that this broad phraseology evinces a congressional intent to strike at the entire spectrum of discrimination in employment. *Meritor Savings Bank,* — U.S. at —, 106 S.Ct. at 2404.

The reasoning of *Meritor Savings Bank* regarding claims of racial and sexual discrimination under Title VII is also applicable to claims of retaliation under the Title. Retaliation is just another form of discrimination prohibited by Title VII; the Title prohibits employers from discriminating against employees because they exercised their rights under the Title. 42 U.S.C.A. § 2000e–3. If one is to remain true to Congress's mandate that the entire spectrum of discrimination is subject to the prohibitions of Title VII, then one must conclude, as does this court, that "verbal conduct of a retaliatory nature" is also prohibited where the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. The court's November 25 order merely effected this intent behind Title VII.

To be sure, the mayor and the police chief made these statements in public. Assuming that the statements concerned a matter of public concern, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the court must conclude that, because of the strong national interest in completely ridding discrimination from the workplace, both public and private, any interest the public may have in the statements must give way to the interest of Title VII; the balance must be struck in favor of Title VII. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ It is important, however, to emphasize that the restrictions of Title VII on public speech are very limited. First, the restriction applies only to employers. Second, not all speech is covered; the speech must be of a racial, sexual or retaliatory nature or of some similar nature falling within the coverage of Title VII. And third, the speech must have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work-

ing environment, before it may be considered prohibited by Title VII. Here, the mayor and the police chief were, in effect, Pierce's employers. Admittedly, they claim that when they made their statements they were speaking as private citizens and thus exercising their first amendment rights as such citizens. But it would strain common sense to believe that they had such access to the press merely because they were private citizens; rather, without question, they were speaking in their official capacities as city employers, about one of their employees. Furthermore, as already demonstrated throughout this order, their statements were of a retaliatory nature and had both the purpose and effect of unreasonably interfering with Pierce's work performance and her work environment. The mayor's and the police chief's statements were not constitutionally protected; rather, they fell within the prohibition of Title VII. The November 25 order, which merely effected Title VII, is therefore valid.

### III.

■ The final issue for the court is appropriate compensation for Pierce. As stated, the mayor's and police chief's statements demeaned and demoralized Pierce in her employment; because of their statements, her respect by others in the department has been impaired and, undoubtedly, as a result, her ability to function in the department has been made more difficult. Pierce is entitled to be compensated for this loss of respect in her job and for all other losses that proximately flowed from her loss of respect. The court is of the opinion that $3,500 will adequately compensate her for these losses. The mayor and police chief will be required to pay this amount to Pierce.

The mayor and police chief point out that at the hearing on Pierce's request for civil contempt, they agreed to post a notice in the police department requiring that Pierce's fellow officers treat her with respect. The court understands that the notice was later posted. The court has considered this recent conduct as a mitigating factor in determining the amount of money Pierce should recover.

For the foregoing reasons, it is the OR-DER, JUDGMENT, and DECREE of the court that:

(1) It is declared that defendants Emory Folmar and John Wilson are in civil contempt of the November 25, 1986, order of the court;  and

(2) Plaintiff-intervenor Sandra M. Pierce have and recover from defendants Folmar and Wilson the sum of $3,500.00.