**Paul David TASKER, Plaintiff,**

v.

**Arch A. MOORE, Jr., A.V. Dodrill, and Clarence M. White, Defendants.**

**Michael ENGLAND, Darwin Barnes, and James Adkins, Plaintiffs,**

v.

**A.V. DODRILL, Arch A. Moore, Jr., and Clarence White, Defendants.**

Civ. A. Nos. 2:86–0823, 2:86–0962.

United States District Court,
S.D. West Virginia,
at Charleston.

March 30, 1990.

---

William F. Byrne, Morgantown, W.Va., Larry Harless, Charleston, W.Va., for plaintiffs.

James A. Swart, Asst. Atty. Gen., Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on various trial and post-trial motions made by the defendants Arch A. Moore, Jr., former Governor of the State of West Virginia, A.V. Dodrill, former Commissioner of the West Virginia Department of Corrections, and Clarence M. White, former Warden of the Huttonsville Correctional Center.

### I. *Background*

The Honorable Larry V. Starcher, sitting by special assignment as judge of the Circuit Court of Randolph County, West Virginia, in a suit against Clarence White as warden of the Huttonsville Correctional Center and A.V. Dodrill as the commissioner of the West Virginia Department of Corrections, decreed on February 22, 1985, that the Huttonsville Correctional Center was unconstitutionally overcrowded. *Nobles* v. *Gregory*, Civil Action No. 83–C–249 (Cir.Ct. Randolph County, W.Va.1985). The Department of Corrections was given one year to reduce the inmate population to constitutionally acceptable limits, which the court set at no more than 500. At the conclusion of the year, the inmate population at Huttonsville had increased.

Judge Starcher conducted investigatory hearings on March 17 through 20, 1986. As a result of these hearings, Judge Starcher entered a total of 56 dispositional orders releasing 56 inmates from Huttonsville. Included in these dispositional orders were two orders dated April 1, 1986, and April 11, 1986, directing the release from Huttonsville of plaintiffs James Adkins and Paul Tasker, respectively. Adkins was ordered to be released immediately and Tasker was ordered to be released within 20 days from the date of the order.

On April 4, 1986, defendants White and Dodrill filed with the West Virginia Supreme Court of Appeals a motion seeking a stay of Judge Starcher's release orders,[1] pending appeal of the underlying *Nobles* decision. Stay was granted until May 9, 1986. On May 7, 1986, the West Virginia Supreme Court refused the appeal of the underlying *Nobles* decision, and on May 8, 1986, the court refused to enter a further stay of the dispositional orders.[2]

As a result of the termination of the stay and the continued failure of defendants Dodrill and White to comply with the dispositional orders and release plaintiffs Tasker and Adkins as well as other inmates, Judge Starcher set for hearing on May 27, 1986, a petition for contempt and motion for compliance. The order specifically directed defendants Dodrill and White to appear before the court and bring the bodies of plaintiffs Tasker and Adkins, as well as other named inmates, to the hearing on May 27, 1986. Governor Moore, in response to Judge Starcher's attempts to effect compliance with the dispositional orders, dispatched a letter to Justice Thomas B. Miller, Chief Justice of the West Virginia Supreme Court of Appeals. In the letter, Governor Moore expressed his concern about recent decisions by the judiciary as interfering with the efforts of the executive branch to bring about an equitable solution to the problem of overcrowded prisons.[3] Governor Moore made reference

---

1. In their motion for a stay, defendants Dodrill and White specifically asked the West Virginia Supreme Court to stay any existing as well as future release orders issued by Judge Starcher, thus encompassing the April 11, 1986, order releasing plaintiff Tasker.

2. The West Virginia Supreme Court initially granted the April 4, 1986, motion for a stay and, upon appeal of the *Nobles* decision, extended the stay to remain in effect until May 9, 1986. The May 8, 1986, order refusing to grant any further stays made compliance with the dispositional orders mandatory after May 9, 1986.

3. One of those efforts of the executive branch referenced by Governor Moore was the issuance of Executive Order No. 11–86 (May 26, 1986), directing that "the West Virginia Department of Corrections will not, as of this date, accept for imprisonment any new inmates until such time as the Commissioner of Corrections and the Governor have determined that conditions at each institution are appropriate and warrant the acceptance of additional inmates." *See State ex rel. Dodrill v. Scott,* 352 S.E.2d 741 (W.Va.1986) (West Virginia Supreme Court invalidated Executive Order No. 11–86 as in conflict with statutory scheme requiring Department of Correc-

to the hearing set by Judge Starcher and stated, "I have, furthermore, ordered the Commissioner and the Warden not to appear at the hearing on Tuesday, but rather to stay at their posts." [4]

Defendants Dodrill and White, obeying the command of Governor Moore, refused to appear at any time before Judge Starcher or bring to the court any of the named inmates. On May 29, 1986, the court issued an order detailing the continued refusal of defendants Dodrill and White to obey the court's orders. Although the wording of the order is conciliatory in the sense of acknowledging the difficult position of the Governor, the order is firm in requiring compliance with the previously entered dispositional orders.[5] In this regard, the court made it quite clear, in the last paragraph of the order, that its previous orders releasing prisoners, including plaintiffs Tasker and Adkins, remained in effect and would not be stayed.[6]

Pursuant to an inter-office memorandum from Governor Moore to the Board of Probation and Parole urging expedited parole interviews of the inmates who had received dispositional orders from Judge Starcher, plaintiff Adkins had a parole interview on August 7, 1986, and was released on September 4, 1986. Defendants Dodrill and White were ordered to appear and bring the body of plaintiff Tasker before Judge Starcher at a hearing to be held on September 19, 1986, to show cause why defendants Dodrill and White should not be held in civil contempt of court. At the scheduled hearing, defendants Dodrill and White appeared with plaintiff Tasker and relinquished control of Tasker to the jurisdiction of the court, whereupon Judge Starcher released Tasker on that same day.

Thereafter, plaintiffs Adkins and Tasker[7] brought suit under Title 42, United States Code, Section 1983, for deprivation of their constitutionally protected liberty interests and for false imprisonment under state law. At trial, both defendants White and Dodrill testified that they were aware of the existing release orders as well as the dissolution of the stay of the orders as of May 9, 1986. Further, defendants White and Dodrill testified that their sole reason for not releasing Adkins and Tasker was

---

tions to receive and incarcerate individuals sentenced to state penal facility).

4. The paragraph of Governor Moore's letter containing the sentence quoted in the text reads in full:

The recent effort of Judge Starcher to cause the sudden release of scores of prisoners from Huttonsville is not, in my judgment, a proper or professional way to achieve the results we all desire. I cannot permit his intrusion to interfere with the orderly workings of the processes we have put in place, nor can we condone the tension his involvement causes at the institution. Accordingly, I have instructed the Commissioner of the Department of Corrections and the Warden at Huttonsville to proceed with the plans outlined above, and to refrain from releasing any prisoners without following all the processes to which the citizens of West Virginia are entitled and, additionally, without the approval of this office. I have, furthermore, ordered the Commissioner and the Warden not to appear at the hearing on Tuesday, but rather to stay at their posts. Defendants' Exhibit 2, letter from Governor Arch A. Moore, Jr., to Justice Thomas B. Miller, at p. 2.

5. In an effort to avoid what the court characterized as a potential constitutional crisis, the court stated that it would continue the hearing on the motion for contempt and the motion for compliance for a period not to exceed 20 days so as to allow defendants Dodrill and White to advise the court of their intended actions with respect to the dispositional orders. The primary thrust of the court's order was an attempt to obtain compliance with its dispositional orders in a way that would avoid a constitutional crisis.

6. The court stated: "It is further *ORDERED THAT NO STAY IS BEING GRANTED* in this matter with regard to the actions taken in orders affecting the aforesaid individuals, but rather only a continuance not to exceed 20 days." (Emphasis in original)

7. Plaintiffs Tasker and Adkins had brought separate actions which were consolidated by the court on February 17, 1988. Plaintiff Adkins was joined in his suit by Michael England, Jesse Marcum and Darwin Barnes. In the interim between filing the suit and the commencement of trial, Jesse Marcum died and the court issued a memorandum order on August 17, 1988, granting defendants' motion to dismiss the claim of Marcum's widow for failure of that claim to survive her husband's death. On the same date, the court severed the claims of plaintiffs England and Barnes for purposes of trial and continued their cases to a time to be fixed by the court.

that they were following the orders of Governor Moore. Finally, they both stated that without the order of the Governor to not release the inmates, they would have complied with Judge Starcher's orders.

Defendant Moore testified that he was likewise aware of the release orders and the dissolution of the stay, but did not allow the inmates to be released because he believed Judge Starcher's orders were invalid under the separation of powers doctrine and that since he was not a named party to the proceedings, he was under no duty to comply with the orders. Finally, Judge Starcher testified that although he attempted to work out a solution with the executive branch, at no time did he stay his orders.

At the close of the plaintiffs' evidence, the defendants moved for a directed verdict as to the validity of Judge Starcher's orders and their binding effect on Governor Moore and as to the qualified immunity of all three defendants. At the close of all the evidence, plaintiffs moved for a directed verdict on the issue of the liability of the three defendants. Defendants renewed their previous motion for directed verdict and defendant Moore also moved for a directed verdict on the theory of absolute immunity. While deferring ruling on the defendants' motions, the court granted the plaintiffs' motion as to liability and allowed the issue of damages to go to the jury. The court limited all damages to that occurring after the lapse of thirty days following the West Virginia Supreme Court's dissolution of the stay as of May 9, 1986, and allowed punitive damages to be assessed only as to defendant Moore inasmuch as the plaintiffs waived their claim of punitive damages as to the other two defendants. After being so instructed as to damages, the jury returned a verdict of $19,000 in compensatory damages as to plaintiff Tasker against all three defendants and $13,500 in compensatory damages as to plaintiff Adkins against all three defendants. The jury returned two verdicts of $100,000 each in punitive damages against defendant Moore, one for Adkins and one for Tasker.

Pending before the court are the motions of the three defendants for a new trial and related relief styled Motion to Set Aside Damage Assessment and Partial Directed Verdict, and their motion made at the close of plaintiffs' evidence for a directed verdict with respect to the validity of Judge Starcher's orders and as to the defendants' qualified immunity defense, as well as the alternative motion made by Governor Moore at the close of all the evidence for a directed verdict with respect to the application of absolute immunity as to him.

## II. *Discussion*

### A. Qualified Immunity

■ Under certain circumstances, public officials performing discretionary duties may be immune from liability for suits brought under Title 42, United States Code, Section 1983. While defendant Moore argues that he, as governor, is entitled to an absolute immunity, the case cited by him in support of this proposition, *Nixon v. Fitzgerald,* 457 U.S. 731, 749–56, 102 S.Ct. 2690, 2701–05, 73 L.Ed.2d 349 (1982), merely holds that the President of the United States, by virtue of his unique office, enjoys absolute immunity for acts performed by him pursuant to authority committed to him by the constitution and by statute and for acts within the "outer perimeter" of his official responsibility. The immunity afforded to other executive officials, including governors of the several states, is not absolute, rather it is qualified. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (executive officials including governor enjoy only a qualified immunity not an absolute immunity).

■ The qualified immunity so conferred is an affirmative defense which, in order to be successfully asserted, must be pled by the official who must also carry the burden of its proof. *See Arebaugh v. Dalton,* 730 F.2d 970, 972 (4th Cir.1984).

Before 1982, in order to successfully assert a qualified immunity, executive officials had to satisfy both an objective reasonableness standard as well as a subjective good faith component. *See Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992,

1000, 43 L.Ed.2d 214 (1975). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court modified the qualified immunity test, eliminating inquiry into the subjective element. The court observed that "[t]he subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* [*v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)] that insubstantial claims should not proceed to trial." *Harlow,* 457 U.S. at 815–16, 102 S.Ct. at 2737. While recognizing the need to balance protection of civil rights with the protection of public officials in order to encourage "the vigorous exercise of official authority," the *Harlow* court concluded that:

> [B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 817–18, 102 S.Ct. at 2738.

■ Thus, the threshold question to be answered by a court presented with a defense of qualified immunity is whether the law was "clearly established" at the time the action complained of was taken. If the law was so established, the immunity defense will fail unless "extraordinary circumstances [surrounded the action and the official] can prove that he neither knew nor should have known of the relevant legal standard." 457 U.S. at 818–19, 102 S.Ct. at 2738. Once again, this further inquiry turns upon objective factors. *Id.* Even though the official did not know of the relevant legal standard, he is nevertheless to be held accountable if he should have known.

Five years after *Harlow* was decided, the Court in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), defined the degree to which legal rules must be "clearly established" in order to subject an official to liability for their violation. The Court explained:

> The operation of this standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

107 S.Ct. at 3038–39 (citation omitted).

Following *Harlow* and *Anderson,* the Fourth Circuit in *Sevigny v. Dicksey,* 846 F.2d 953, 956 (4th Cir.1988), framed the qualified immunity inquiry as proceeding on a general "objective legal reasonableness" level as well as a more specific fact-oriented level.

■ It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment. *See Johnson v. Muel-*

*ler*, 415 F.2d 354, 355 (4th Cir.1969) (inmate's allegations that superintendent of prison kept him confined past term of his sentence was actionable under section 1983); *Speaks v. McGregor*, 355 F.Supp. 1129, 1131–32 (W.D.Va.1973) (holding fugitive past allowable time period under state law is actionable under section 1983); *see also Gay v. Wall*, 761 F.2d 175, 178–79 (4th Cir.1985) (complaint alleging officials knew arrestee was innocent but detained him until the right man was found stated cause of action under section 1983). While *Anderson* specifically states that a previous holding by a court that certain conduct is unlawful is not required in order to prove that the law was "clearly established," in this instance the foregoing cases remove any doubt. In light of these cases, it is clear that the constitutional rights of the plaintiffs, which protect them from being incarcerated past the time ordered for their release, were "clearly established" at the time of the refusal of defendants White and Dodrill to release them and Governor Moore's order to not release them notwithstanding the mandate of Judge Starcher's decree.

Finally, there were no extraordinary circumstances that prevented defendants White and Dodrill from knowing the relevant legal standard. They both knew that they were under a duty to release Adkins and Tasker, and that refusal to do so would violate the inmates' constitutional rights, but chose instead, at their own peril, to follow orders of their superior. None of the three defendants denies specific knowledge of Judge Starcher's orders directing the release of plaintiffs Adkins and Tasker.

Neither do the defendants deny knowledge of the fact that the stay of the release orders was dissolved by the West Virginia Supreme Court of Appeals as of May 9, 1986. Instead, defendants White and Dodrill contend that in refusing to release Adkins and Tasker, they were simply following orders.

In *Putman v. Gerloff*, 639 F.2d 415 (8th Cir.1981), a case decided prior to the United States Supreme Court's decision in *Harlow*, *supra*, the Eighth Circuit addressed the viability of the "following orders" defense in the context of a claim of qualified immunity. The Eighth Circuit found that the "following orders" defense is not a defense in and of itself, but rather is merely a relevant inquiry into the subjective good faith defense, subsequently abolished by *Harlow*, *supra*. *Putman*, 639 F.2d at 422–23. Accordingly, "if [officials] knew or should have known that their actions were violating the plaintiff's constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty" by claiming they were simply following orders. *Id.* at 423 (quoting *Forsyth v. Kleindienst*, 599 F.2d 1203, 1217 (3rd Cir.1979)).

Inasmuch as defendants White and Dodrill knew that Adkins and Tasker had been ordered released, together with the reality that further incarceration of an inmate past release constitutes a violation of "clearly established" constitutional rights, defendants White and Dodrill are not entitled to qualified immunity for their actions.[8]

### B. Validity of the Release Orders

■ Governor Moore contends that because he was not a named party to either

---

**8.** As the court observed in directing a verdict against defendants White and Dodrill:

> The defendants White and Dodrill, the court finds, were subject to and required to comply with the valid and subsisting order of the Circuit Court of Randolph County directing the release of the plaintiffs Tasker and Adkins. Once the stay of those orders by the West Virginia State Supreme Court was terminated as of May 9, 1987 [sic], the defendants White and Dodrill were bound to comply with those decrees by releasing ... Tasker and Adkins. Indeed, the defendants White and Dodrill acknowledged that they would have complied with those orders except for the

express direction of their superior, Governor Moore, that they not do so.

> As to the defendants White and Dodrill, the law was already clearly established by those decrees and they were aware of those orders with which they were personally directed to comply. Although they were placed in an unusually difficult and uncomfortable position by virtue of the direction of Governor Moore, they remained under court order to release the plaintiffs Tasker and Adkins. Under these circumstances, the defendants White and Dodrill are not entitled to a qualified immunity.

Transcript at 459.

the underlying prison conditions lawsuit or the dispositional release orders, including the orders releasing plaintiffs Adkins and Tasker, he was under no obligation to allow their release. Although the orders did not direct him to take any action, Governor Moore argues that the failure of the plaintiffs to join him as a party pursuant to Rule 19 of the West Virginia Rules of Civil Procedure [9] renders the orders invalid to the end that his action in ordering defendants White and Dodrill to in essence violate Judge Starcher's orders was not unlawful. In *Pauley v. Gainer*, 353 S.E.2d 318 (W.Va.1986), the West Virginia Supreme Court held that in an action challenging the validity of the governor's line-item veto power, the governor was an indispensable party pursuant to W.Va.R.Civ.P. 19. In so holding, the court explained:

> [T]he Governor must be deemed to be an indispensable party since it is his action regarding the line-item veto which is the subject matter of the litigation.... [H]e has "an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may ... as a practical matter impair or impede his ability to protect that interest ...."

*Id.* at 320 (quoting W.Va.R.Civ.P. 19). However, the court qualified its holding, noting:

> In holding that the Governor was an indispensable party, we do not wish to imply that in other suits involving subordinate executive officers that the Governor must always be joined as a party.

Much depends on whether the Governor has a substantial and direct involvement in the issue litigated.

*Id.* at 321.

The court in *Pauley* found support for its conclusion in two California Supreme Court cases challenging the constitutionality of statutes in which it was held that neither the governor or lawmakers in one of the cases nor judges in the other case had the immediacy or directness of interest necessary for party status. *See Serrano v. Priest*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 358, 557 P.2d 929, 942 (1977) (neither governor nor legislature were indispensable parties to action attacking constitutionality of public school financing) and *VanAtta v. Scott*, 27 Cal.3d 424, 166 Cal.Rptr. 149, 613 P.2d 210 (1980) (judges not indispensable parties to action challenging statute concerning release on own recognizance). Rather, the presence of those having a direct interest, being the state administrative officers charged with administration of a statute, assures that the more remote interests of the governor and other lawmakers are fully and adequately represented. *Serrano*, 135 Cal.Rptr. at 358, 557 P.2d at 942.

It is apparent that Governor Moore was not an indispensable party to the *Nobles* litigation in the Circuit Court of Randolph County.[10] That action had its genesis in a petition for writ of mandamus filed in the West Virginia Supreme Court of Appeals in 1983, seeking an order directing the commissioner of the Department of Corrections and the warden of Huttonsville Correction-

---

**9.** Paragraph (a) of Rule 19 sets forth the rule for mandatory joinder of an interested person as a party, and provides as follows:

> Rule 19. Joinder of Persons Needed for Just Adjudication. (a) *Persons to be joined if feasible.*—A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not

been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

If the court determines that a person is subject to the above rule, then he must be joined as a party. If he cannot be joined, paragraph (b) of Rule 19 provides the analysis which the court must undertake to determine whether the case may proceed without such person.

**10.** That action was styled *Nobles, et al. v. Gregory, et al.*, Civil Action No. 83–C–249.

al Center to correct unconstitutional conditions at that facility, including overcrowding.[11] Unlike the direct challenge of a gubernatorial power in *Pauley*, the plaintiffs in *Nobles* neither sought to invalidate an action taken by the governor, nor did they undertake to compel action by him. Rather, they sought to compel action by state administrative officials charged with the administration of Huttonsville Correctional Center. *See* W.Va.Code § 62–13–4 (charging the Department of Corrections with the overall administration of correctional facilities within the State of West Virginia), and W.Va.Code § 25–1–11 (charging the warden with the day-to-day administration of the facility to which he is appointed).

Each year, many suits are brought alleging unconstitutional conditions of confinement. These suits are properly brought against the commissioner of the Department of Corrections and the wardens of the facilities inasmuch as it is they who are charged, by statute, with the administration of correctional facilities. *See, e.g., Crain v. Bordenkircher*, 342 S.E.2d 422 (W.Va.1986), decided March 27, 1986, (habeas corpus petition filed against commissioner and warden alleging unconstitutional conditions of confinement at the West Virginia State Penitentiary at Moundsville).

In finding that Governor Moore was not a person who must have been joined, the court notes that the governor was aware that the *Nobles* case was ongoing and was free to intervene pursuant to Rule 24 of the West Virginia Rules of Civil Procedure but chose not to do so. Accordingly, the orders releasing the plaintiffs were not void for failure to join Governor Moore as a party in *Nobles*.

■ In *Flanigan v. W.Va. Pub. Employees' Ret. System*, 352 S.E.2d 81 (W.Va. 1986), decided December 12, 1986, the West Virginia Supreme Court of Appeals, in the context of a contempt proceeding, had occasion to consider the responsibility of state officials to obey court orders. *Flanigan* involved suit brought against, among oth-

ers, the executive secretary of the West Virginia Public Employees' Retirement System, for an order to show cause why he should not be held in contempt for failure to comply with a previous order of the court directing the Retirement System to allow Flanigan to participate in its retirement program.

The court held:

> Every functionary of state government, whose action is essential to the execution of official process in the administration of justice, is bound to respond to and implement orders of this Court of which he has knowledge regardless of whether such functionary is personally named in such order.

*Id.* Syl. pt. 2 at 83, 87. The court applied the above principle to hold the executive secretary in contempt for his actions in obstructing enforcement of the court's prior order, even though he was not a party to the original action that resulted in the order directing the Retirement System to allow Flanigan to participate in its retirement program. *Id.* at 86–87. In so holding, the court relied upon antecedent case law of West Virginia. *See State ex rel. Walker v. Giardina*, 294 S.E.2d 900 (1982) (non-party with knowledge of court order may be held in contempt for its violation); and *Hendershot v. Handlan*, 162 W.Va. 175, 248 S.E.2d 273 (1978) (same).

■ With respect to orders issued to remedy constitutional rights violations, the party aggrieved by refusal of an official to comply with such orders may bring an action against the official pursuant to section 1983. In *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir.1989), the Ninth Circuit held that failure of the City to provide all prisoners with beds in compliance with an order entered in a prior action was actionable under section 1983. Unlike defendant Moore, the City in *Thompson* was a party to the prior action in which the order was entered. However, as earlier noted, non-parties may under *Flanigan* and its predecessors be held in civil contempt for failure to comply with an order.

---

11. The West Virginia Supreme Court on July 5, 1983, issued a rule directing that the case proceed before Judge Larry V. Starcher as Special Judge of the Circuit Court of Randolph County.

Inasmuch as civil contempt may be invoked in order to compensate the complainant for losses occasioned by non-compliance, *see Jordan v. Wilson*, 662 F.Supp. 528 (M.D. Ala.1987), it follows that a state official, even a non-party to the action in which the order was entered, may under the circumstances presented here be liable to a plaintiff for damages under section 1983 for injuries incurred by reason of the official's willful interference and refusal to comply with an order entered for the purpose of securing the constitutional rights of a party.

For the foregoing reasons, the court finds that defendant Moore, as the Governor of the State of West Virginia at the time Judge Starcher entered the orders releasing Adkins and Tasker and having knowledge of the requirements of those orders, was bound to respect and refrain from interfering with the implementation of those orders even though he was not personally named in the orders.[12]

### C. Separation of Powers

■ Additionally, defendants argue that Judge Starcher's release orders were void under the doctrine of separation of powers.[13] Specifically, defendant Moore argues that the express power conferred on him by Article VII, section 11 of the West Virginia Constitution, which gives the governor the power to commute sentences and to order pardons, precludes a circuit court from ordering the release of state prisoners prior to the expiration of their sentence. Similarly, defendants Dodrill and White urge that Chapter 62, article 13 of the West Virginia Code, granting final determination of release of prisoners on parole to the parole board and granting the general supervision over the administration of the

state's correctional facilities to the Commissioner of the Department of Corrections, and Chapter 25, article 1, of the West Virginia Code, providing for the appointment of wardens for each facility, commits the release of convicted prisoners prior to expiration of the sentence received to the executive branch of the state government.

However, prisoner overcrowding may rise to the level of cruel and unusual punishment protected by the Eighth Amendment to the United States Constitution, whose provisions constitute the supreme law of the land. Indeed, in *Crain v. Bordenkircher*, 342 S.E.2d 422, 448–49 n. 27 (W.Va.1986), the West Virginia Supreme Court of Appeals observed that in confronting unconstitutional prison conditions, one of the remedies available to the court is to order the release of inmates to alleviate overcrowding.

Similarly, in *Ruiz v. Estelle*, 679 F.2d 1115, 1148 (5th Cir.), *modified*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983), the Fifth Circuit stated that while a mandate from a court that good time, parole and furlough programs must be utilized to relieve overcrowding tends to invade the management responsibilities of state officials, such a mandate is appropriate where failure to comply with court-imposed maximum capacity limitations demonstrates the need for judicial interference.

As earlier noted, Judge Starcher, over one year prior to entry of his orders releasing the inmates, ordered the Department of Corrections to decrease its population at Huttonsville to a maximum of 500 within one year's time. Not only did the Department of Corrections fail to meet that limita-

---

**12.** As the court stated in directing a verdict against defendant Moore:

> Governor Moore, knowing the orders to release Tasker and Adkins, and knowing that the stay was terminated as of May 9, 1986, nevertheless directed the defendants White and Dodrill not to comply with those orders. Governor Moore was not himself a party to the orders or the proceeding out of which they arose and, for that reason and others, Governor Moore contends that he was not bound by those decrees. The court observes that those with knowledge of the orders of

release, including Governor Moore, were bound to respond to those decrees and implement them. Thus, Governor Moore is similarly not entitled to a qualified immunity.

Transcript at 459–60.

**13.** Defendants are correct in contending that under the reasoning of *Migra v. Warren City School District*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984), this court should give the same effect to the state court order as would be given under state law.

tion, the prison population at Huttonsville actually increased during that time period. Such noncompliance clearly demonstrated the need for further judicial action. Accordingly, the orders to release Adkins and Tasker were not violative of the doctrine of separation of powers and under the Eighth and Fourteenth Amendments to the United States Constitution created in Adkins and Tasker a liberty interest. *See Gay v. Wall, supra, Johnson v. Mueller, supra,* and *Speaks v. McGregor, supra,* at pages 1010–11.

For the foregoing reasons, the court finds that the interests of Adkins and Tasker in being released on the date ordered by Judge Starcher rose to a constitutional level, that those constitutional interests were "clearly established" at the time of the defendants' actions, that the release orders were valid and binding on all three defendants, and that the defendants are not entitled to qualified immunity for their actions.

### III. *Punitive Damages*

■ In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1982), the Supreme Court determined that punitive damages may be recovered against a public official sued in his individual capacity where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. *See Cooper v. Dyke,* 814 F.2d 941, 948 (4th Cir.1987). Although Governor Moore was placed in a difficult position, he knew that the release order had been issued and the stay had been dissolved; thus the evidence supported a finding that he acted with reckless indifference to the federally protected rights of plaintiffs Adkins and Tasker, rendering punitive damages appropriate under the circumstances.

Governor Moore argues that the imposition of punitive damages violates the excessive fines clause of the Eighth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment. In *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* — U.S. —, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the Supreme Court rejected such an argument based on the Eighth Amendment by stating:

> This Court has never held, or even intimated, that the Eighth Amendment serves as a check on the power of a jury to award damages in a civil case. Rather, our concerns in applying the Eighth Amendment have been with criminal process, and with direct actions initiated by government to inflict punishment. Awards of punitive damages do not implicate these concerns.

*Id.* 109 S.Ct. at 2912. The Court in *Browning–Ferris* acknowledged that the due process clause may in certain circumstances act as an outer limitation on excessive punitive damage awards, but refused to address the issue because it was not properly before the court.

Determination of the amount of punitive damages lies within the province of the trier of fact, in this case the jury. *Gordon v. Norman,* 788 F.2d 1194 (6th Cir.1986). The amount of punitive damages awarded by a jury should not be disturbed "absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invalidated the trial." *Barnes v. Smith,* 305 F.2d 226, 228 (10th Cir.1962). Under federal law, the judge is to set aside a damage verdict only where it is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Johnson v. Parrish,* 827 F.2d 988, 991 (4th Cir. 1987).

■ In civil rights cases, no actual damages need be shown to warrant an award of punitive damages. *Basista v. Weir,* 340 F.2d 74 (3d Cir.1965). Therefore, the ratio of punitive damages to compensatory damages is not a factor to be considered under federal civil rights law. However, the amount of punitive damages awarded against an official for a civil rights violation must be based upon his personal financial resources, *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 269, 101 S.Ct. 2748, 2760–61, 69 L.Ed.2d 616 (1981), since

**1016**

the defendant will be personally liable for such damages which must be paid from his own resources. *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). The evidence before the jury was that Governor Moore's net worth was in the range of $330,000 and his annual salary as governor $72,000.

█ The amount of punitive damages awarded in this case is clearly excessive. To allow the punitive award to stand in the amount of $100,000 for each of these two plaintiffs would work a plain miscarriage of justice. A punitive damages recovery of this magnitude would also have some tendency to chill bold and courageous actions of state chief executives both in and out of this state as they undertake to meet the mounting crises that confront governors with increasing frequency throughout the nation. That is not to suggest that a governor should never be subjected to punitive damages for actionable misconduct ranging far beyond the powers of the office. Governor Moore's defiant actions plainly exceeded his authority when he acted largely upon the misguided belief that the separation of powers doctrine vested in the executive the exclusive authority to release state prisoners notwithstanding the state court's adjudication that prisoner release was mandated in order to relieve unconstitutional overcrowding. The two prisoner plaintiffs in this case who were among the fortunate inmates scheduled by the state court for early release have been compensated by the jury in the combined sum of $32,500 for the some four months during which their release was delayed by the defendants. Adding another $200,000 in punitive damages is as needless as it may be intimidating to another governor on another occasion when creative or innovative action, coupled with courage and conviction in abundant measure, may be required to meet the challenge of new and complex problems.

It is further observed that the plaintiffs and the other inmates in this case were ultimately afforded an early release from custody at the instance of Governor Moore, delayed though it was. Moreover, as punishment, the jury's award of punitives is far too great. As a deterrent to Governor Moore, it is no longer necessary inasmuch as his term of governor ended some five months after the trial. As a deterrent to other governors, it is more likely to discourage bold and decisive initiative than inhibit unwarranted unconstitutional acts. Under these circumstances, while recognizing that the award of punitive damages cannot be fixed with anything approaching scientific exactitude, a punitive award of $10,000 to each of these two plaintiffs amply takes into account the compensatory award and all of the surrounding circumstances of this case so as both to punish and to serve as a warning that steps be taken to avoid future misconduct of the nature found by the jury in this case. At the same time, punitive damages totaling $20,000 are plainly "enough to smart." *Shamblin's Ready Mix, Inc. v. Eaton Corp.*, 873 F.2d 736, 743 (4th Cir.1989).

In order to avoid the miscarriage of justice that would otherwise occur, the court directs that each the plaintiffs Paul David Tasker and James Adkins either agree to remittitur of all but $10,000 of the punitive damage award or, as to the plaintiff failing so to do, resubmit the issue of the amount of the punitives at a new trial for that purpose. Each plaintiff shall notify the court in writing of his decision within fifteen days. Failure to file such written notice not later than April 16, 1990, will result in the setting of a new trial with respect to the amount of punitive damages as to that plaintiff.

## IV.

For the reasons given above, it is accordingly ORDERED that:

1. The motions of the defendants for a directed verdict be, and the same hereby are, denied;

2. The motion of the defendants for a new trial be, and the same hereby is, denied in all respects except as to the issue of the amount of punitive damages award against the defendant Arch A. Moore, Jr.;

3. With respect to the issue of the amount of punitive damages, the motion of the defendant Moore for a new trial be, and the same hereby is, granted as to each the plaintiff Paul David Tasker and the plaintiff James Adkins unless that plaintiff agrees to a remittitur of all but $10,000 in punitive damages, in which case the motion for a new trial as to that plaintiff shall be denied;

4. The plaintiffs shall advise the court on or before April 16, 1990, as to whether or not each wishes to accept the proposed remittitur pursuant to which punitive damages as to that plaintiff would be assessed in the sum of $10,000;

5. In the event plaintiff Tasker or plaintiff Adkins fails so to advise the court on or before April 16, 1990, or in the event such plaintiff advises that he declines to accept the proposed remittitur, the motion for a new trial as to the amount of punitive damages as to that plaintiff shall be granted; and

6. The parties are directed to submit, on or before April 23, 1990, a proposed judgment order for entry in keeping with this decree and the decision respecting remittitur to be made by each plaintiff.