Sammy HUDDLESTON, Plaintiff,

v.

**Jack SHIRLEY, Individually and in his Official Capacity as Sheriff of Lee County, Mississippi, Defendant.**

No. EC90–189–S–D.

United States District Court,
N.D. Mississippi, E.D.

March 20, 1992.

James E. Waide, Jr., Tupelo, Miss., for plaintiff.

William Beasley, Tupelo, Miss., for defendant.

### OPINION

SENTER, Chief Judge.

This § 1983 case involves allegations that the defendant sheriff refused to comply with a state court order which directed that the plaintiff be released from jail during the day to go to work. Presently before the court are cross-motions for summary judgment on the question of liability only.

### FACTS

The underlying facts of this case are not in dispute. On April 27, 1990, plaintiff Sammy Huddleston, through his attorney and with the approval of the county prose-

cutor, entered a plea of guilty to the charge of resisting arrest. The order entered by the judge for the County Court of Lee County, Mississippi, accepting this plea provided that Huddleston pay a $200 fine and serve 30 days in jail. This order specified, however, that Huddleston "shall be allowed to leave jail each day to go to his employment and shall return to jail each day when he gets off work." This order was never altered or amended in any way.

Defendant Jack Shirley, the sheriff of Lee County, Mississippi, was charged with taking custody of Huddleston pursuant to the subject order. Because he believed that the part of the order directing Huddleston's release during the daytime was invalid and conflicted with his statutory duties, Shirley, who "questioned the wisdom"[1] of this order, refused to release Huddleston as instructed. Shirley's decision to disregard the court's order was based on his knowledge of Huddleston's prior criminal record and on an informal discussion he had with state Circuit Court Judge Thomas Gardner, who concurred in Shirley's concerns and advised Shirley that he "did not blame him for not following the order." As a result of Shirley's decision, Huddleston served the 30–day sentence without interruption and lost his job.

## DISCUSSION

The question which must be answered before all others is whether Shirley's actions in disobeying the state court order violated a provision of the United States Constitution. Huddleston argues three separate constitutional violations: (1) that Shirley's actions constituted arbitrary government action in violation of substantive due process; (2) that he was deprived of his liberty without due process; and (3) that he was unlawfully "seized" in contravention of the Fourth Amendment.

### I. Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o

State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Clause is phrased as a limitation on the State's power to act," *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989), and was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression...." *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). Reduced to its simplest terms, the purpose of the Due Process Clause "was to protect the people from the State...." *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003.

In particular, "the substantive component of the Clause ... protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.' " *Collins v. City of Harker Heights*, —— U.S. ——, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)). The protections afforded by substantive due process "may be triggered when the State, by affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement." *DeShaney*, 489 U.S. at 200 n. 8, 109 S.Ct. at 1006 n. 8.

Although cases discussing issues similar to those now before this court are scant, they are not nonexistent. For example, in *Tasker v. Moore*, 738 F.Supp. 1005 (S.D.W.Va.1990), a state circuit judge ordered the release of certain prisoners to alleviate overcrowding in the state correctional facility. *Tasker*, 738 F.Supp. at 1007. The governor, who "believed [the judge's] orders were invalid," *id.* at 1009, refused to comply with the court's order and allow the inmates' release. *Id.* In response, the inmates brought suit against the governor and others pursuant to 42

---

1. This is his attorney's characterization. However, according to Huddleston's wife, the sheriff's attitude was expressed to her this way: "[T]here ain't no damn judge going to tell me how to run the jail." Shirley, who characterized Huddleston as "the most undeserving prisoner I had in jail," denies making this statement.

U.S.C. § 1983. *Id.* at 1008. The governor, of course, pled qualified immunity. *Id.* at 1009.

In resolving the immunity issue, the *Tasker* court held: "It is peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment." *Id.* at 1010. *See also Salahuddin v. Coughlin*, 781 F.2d 24, 27, 27 n. 4 (2d Cir.1986) (although state court ordered that inmate be released immediately from special housing unit and returned to general population because of procedural due process violations, prison officials failed to comply; court of appeals held that "the infliction of punishment when not authorized by state law is a classic instance of denial of liberty without due process of law"); *Arce v. Miles*, No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991) (same; "[c]ontinued confinement of an inmate whose release has previously [been] ordered is, when clearly contrary to the state authority, a 'classic instance of denial of liberty without due process of law'").

Although the facts of these cases are not on all fours with the instant case, they are analogous and instructive. Here, it is undisputed that Shirley continued to confine Huddleston in the county jail during the day in direct conflict with the state court order to release him as specified. Shirley himself recognized the mandatory nature of the order and its contours, or he would not have sought the advice of Judge Gardner. Although Shirley's concerns about the validity of the order might impact on his defense of qualified immunity (as to his individual liability), it has no bearing on whether his refusal to obey the order violated Huddleston's substantive due process rights. This order clearly created in Huddleston an expectation that he would be released to go to work. By refusing to obey the order, Shirley in effect substituted his judgment for that of the county court judge and the prosecuting attorney. Unquestionably, Huddleston's liberty interest here was not without bounds and was indeed carefully circumscribed. But the fact that this interest was limited in scope does not make it nonetheless protected by the Constitution.

The court recognizes the peculiar position that Shirley found himself in when faced with an order which he assumed was invalid. However, that order was presumed lawful until determined by a higher court to be unlawful. *Cf. Walker v. City of Birmingham*, 388 U.S. 307, 321, 87 S.Ct. 1824, 1832, 18 L.Ed.2d 1210 (1967) ("respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom"). Shirley never sought a definitive ruling on its validity through any formal means. But Shirley could certainly have gone to the prosecuting attorney who acquiesced in the court's order or to the county judge himself and voiced his concerns. He followed neither of these avenues, choosing instead to informally contact the judge of a different state court, which, until an appeal was perfected, had no jurisdiction over the matter. This course of conduct resulted in Shirley's blatant disobedience of a direct order from the county court. As recognized by the cases previously cited, when Shirley willfully and intentionally held Huddleston in direct conflict with the state mandate to release him to go to work, he infringed on Huddleston's personal liberty protected by the Fourteenth Amendment.

It should be emphasized that this court does not lightly reach this conclusion, for it is well aware of the Supreme Court's "reluctan[ce] to expand the concept of substantive due process...." *Collins*, —— U.S. at ——, 112 S.Ct. at 1068. The court decides this case on its particular facts which involve the disobedience not simply of a court order but of a specific order that created in Huddleston an expectation that he would be released from custody under the prescribed circumstances, thereby crossing the line into the realm of a constitutional violation.

## II. The Immunity Question

Shirley has advanced inconsistent positions as to whether he was a final policymaker so as to bind the county for his official acts. On the one hand, he argues that he was required, pursuant to statutory and common law authority, to take charge of and maintain the prisoners in his custody on a day to day basis. Yet, on the other hand, he contends that this one act did not constitute the official policy of Lee County. Shirley also suggests he can not be held officially liable because he is entitled to qualified immunity.

■ Regarding this latter argument, Shirley confuses the issues of official and individual capacity suits. The qualified immunity defense is only available to protect Shirley, when sued in his individual capacity, from *personal* liability for actions taken in his official capacity. It does not protect him from official liability, for a suit against a government agent in his official capacity is equivalent to a suit against the government entity itself. *See* 1 Martin A. Schwartz et al., *Section 1983 Litigation: Claims, Defenses, and Fees* §§ 6.5 and 7.1, *et seq.* (2d ed. 1991).

■ Lee County may incur § 1983 liability for Shirley's actions in two ways. First, "a [county's] final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees." *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). And second, "the [county] may be held liable for the illegal or unconstitutional actions of its final policymakers themselves as they engage in the setting of goals and the determination of how those goals will be achieved." *Turner*, 915 F.2d at 136. A single unconstitutional decision is sufficient to create county liability if the decisionmaker has been given final policymaking authority by virtue of his office. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (plurality). The issue of whether a particular official has final policymaking authority is undoubtedly a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300.

■ It cannot be disputed that Shirley, as the sheriff of Lee County, was the final policymaker with respect to all law enforcement decisions made in the county. *See* Miss.Code Ann. § 19–25–1, *et seq.* (delineating duties of county sheriff); *see also Pembaur*, 475 U.S. at 484, 106 S.Ct. at 1300 (policymaker is one who has final authority to make choice between several alternatives). That the county did not authorize Shirley to violate the Constitution does not absolve it of liability, for "[w]here a *final* policymaker abuses the power vested in his position to the detriment of a citizen, that abuse can be the basis for suit being brought under section 1983. . . ." *Turner*, 915 F.2d at 137 n. 3 (emphasis in original).

Because the court has found that Shirley, in his official capacity as the sheriff of Lee County, violated Huddleston's substantive due process rights, it need not consider the availability of other constitutional theories to support this § 1983 action. Further, the court will not address the alleged liability of Shirley individually, since Huddleston's counsel has indicated that "[i]f [Huddleston's] Motion [for summary judgment] is sustained against Shirley in his official capacity, I will not pursue the suit against Shirley in his individual capacity." Letter from Honorable Jim Waide to the undersigned dated October 25, 1991.

With the liability question resolved in favor of the plaintiff, the only issue which remains for a jury's consideration is the amount of Huddleston's damages.

An appropriate order shall issue.

## ORDER RELATED TO CROSS–MOTIONS FOR SUMMARY JUDGMENT

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

That plaintiff's motion for summary judgment is granted as to defendant's lia-

bility in his official capacity as sheriff of Lee County, Mississippi;

That defendant's motion for summary judgment is denied.

SO ORDERED.